Atkinson, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
This is a suit growing out of a contract entered into by the plaintiff company with the United States to erect a sawmill, boiler house, and steel chimney at the Mare Island Navy Yard, near San Francisco, Cal., according to certain plans and specifications which are attached to and form a part of the contract. Said contract and specifications are made a part of the petition in this case, to which reference is here made.
The contract was duly signed and executed on the 21st of December, 1898, but it did not provide for the exact location of the structures required to be erected on the navy yard property at Mare Island. It simply provided for the construction of said improvements at said navy yard. The findings show that it was tacitly understood that these proposed improvements were to be erected on a certain portion or part of the Mare Island Navy Yard property, but the definite location was thereafter to be left to the officials of the United States Navy in charge of the work. In accordance with the rules of the Navy Department a board of officers was assembled to inspect the premises and recommend ■to said department a site upon which the structures were to be erected by the contractors. It appears from the findings that the site selected by said board was not approved, and another site was subsequently recommended which was approved and selected as the site for the structures provided for in the contract.
It, however, further appears that prior to the submission of bids, the prospective bidders, including the plaintiff company, visited the navy yard premises and were informed by the naval officials that the exact site for said structures had not been definitely determined; that the location indicated by certain stakes was the point that had been recommended by a naval board, but it was liable to be changed to some other place within the limits of the navy yard. The *54 report of the board recommending a location was not approved by tbe Navy Department, and the board was ordered to reassemble and select another location, which was accordingly done on December 27, 1898, six days after plaintiff company had signed the contract to construct the buildings; and on March 1, 1899, plaintiff company was advised that a permanent site had been chosen. Early in the month of May following one or more of its officers inspected the site that had been selected by the naval board and protested against being required to do the work at the place selected without additional compensation.
In the month of June following, the Bureau of Tards and Docks, acting under a provision in the contract which gave to it the power to decide, refused to allow the claims of the plaintiff company for an increase in price above that which was fixed by the contract. Plaintiff company thereupon refused to proceed with the work, and on'December 7, 1899, the Bureau of Yards and Docks directed the appointment of a board of officers to consider the case and report thereon.
It was thereafter agreed to allow plaintiff company six months’ additional time to complete the work under its contract, but on March 18, 1900, it declined to proceed with the execution of its contract, and on April 26 of said year a supplemental contract was prepared and presented to plaintiff company, which it also declined to execute; consequently, on January 2, 1901, the Bureau of Yards and Docks declared the contract null and void, and immediately thereafter said bureau readvertised the proposed work and entered into a new contract with another party, who executed his contract according to its terms.
By reason of the alleged illegal annulment by the defendants of the plaintiff’s contract, this suit has been instituted to recover from the United States alleged losses on materials, wages of men employed, .time and expenses of officers and employees of plaintiff, general and office expenses chargeable to the contract, cost of changing location of material, cost of testing foundations of the two alleged sites for the construction of the required buildings and smokestack, and anticipated profits on the contract, aggregating $17,308.42. On *55 the other hand, the defendants file a counterclaim of $35,-607.32 as damages resulting from the failure of the plaintiff company to comply with the provisions of its contract.
The plaintiff company had given a bond to secure the performance of its contract, and a suit was brought thereon by the United States in the Circuit Court of the United States for the Eastern District of Pennsylvania, the plaintiff company and its sureties being named as parties defendant to said suit. Plaintiff company was not a resident of Pennsylvania and was not summoned to appear, and did not appear in that action, but proceedings were had against its surety— The American Surety Co. — with the result that there was a verdict and judgment in favor of the surety company.
At the outset, we are met with the contention of plaintiff that the question of breach of the contract is res judicata, because of the judgment in favor of the surety in the said suit in Pennsylvania. As stated by plaintiff’s counsel, “ the main question at issue is, Were the United States legally justified in annulling the contract ” ? and that issue, they urge, “ has already been determined by a court of competent jurisdiction in a suit between parties privy to the parties herein and is therefore res judicata,” and consequently there is nothing for the court to do but to assess the damages which plaintiff alleges to be due.
Having in mind the relation of principal and surety, the proposition that a judgment in favor of the surety should inure to the principal’s benefit and work an estoppel in the latter’s favor when sued upon its contract, would seem, upon the face of it, to be an unusual application of the rule relating to the binding effect of a judgment upon the parties and privies; but as counsel has urged with much earnestness that the defendants here are concluded by the judgment in favor of said surety, although the claimant was not a party to said suit or to the judgment rendered therein, we proceed to consider the question in the light of the authorities involved therein.
The general rule is that where an action is brought in a court of competent jurisdiction, a judgment rendered thereon is conclusive in a subsequent action between the same parties *56 or their privies upon the same subject matter in the same court or another court of concurrent jurisdiction. The maxim of the law is “nemo debet bis vexari fro una et eadem causa,” and the reason of it as stated in Broom’s Legal Maxims, 329, is that “to unravel the grounds and motives which maj have led to the determination of a question well settled by the jurisdiction to which the law has referred it would be extremely dangerous; it is better for the general administration of justice that an inconvenience should sometimes fall upon an individual than that the whole system of law should be overturned and endless uncertainty be introduced.” Confirmatory of this statement it was said by Mr. Justice Clifford in City of Aurora v. West, 7 Wall., 82:
“ Courts of justice, in stating the rule, do not always employ the same language, but where every objection urged in the second suit was open to the parties within the legitimate scope of the pleadings in the first suit and might have been presented in that trial, the matter must be considered as having passed in rem judieatum and the former judgment in such a case is conclusive between the parties.
It was also held in Packet v. Siekles, 24 How., 341, that “ the essential conditions under which the exception of the res judicata becomes applicable or the identity of the thing demanded, the identity of the cause of the demand and of the parties in the character in which they are litigants.” Aspden v. Nixon, 4 How., 467. In Northern Pac. R. Co. v. Slaght, 205 U. S., 122, 131, it was said that “ the general rule of the extent of the bar is not only what was pleaded or litigated but what could have been litigated or pleaded.” In Fayerweather v. Ritch, 195 U. S., 276, the following language is adopted from Cromwell v. Sac County, 94 U. S., 353, which is denominated a leading case:
“The language, therefore, which is so often used, that a judgment estops not only as to every ground of recovery or defense actually presented in the action, but also as to every ground which might have been presented, is strictly accurate when applied to the demand or claim in controversy. Such a demand or claim having passed into judgment can not again be brought into litigation between the parties in proceedings at law upon any grounds whatever.” Western v. New Orleans, 177 U. S., 390, 397.
*57 The rule is thus applicable to the questions actually litigated and to those within the legitimate scope of the pleadings in the cause whether actually raised in the particular case or not.
It is to be noted, however, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand and its effect as an estoppel in another action between the same parties upon a different claim or cause of action, because the estoppel in the latter case operates “ only as to those matters in issue or points controverted upon the determination of which the findings or verdict was rendered.” Keokuk & West R. Co. v. Missouri, 152 U. S., 301, 315; Cromwell v. Sac County, 94 U. S., 351. The general rule has been stated in this court to be that parties and privies are concluded by a judgment of a court of competent jurisdiction upon every material issue clearly presented by the pleadings, tried by the court, and judgment rendered thereon. Langston’s case, 26 C. Cls., 256; Braden’s case, 12 C. Cls., 164.
Confessedly, the plaintiff company was not á party to the Pennsylvania case mentioned, but its counsel contends that it is privy to the defendant therein, who was in fact the surety on its bond given to the United States for the faithful performance of its contract. It was a stranger to that suit and as such is not entitled to plead the estoppel relied on here, unless it be that it was in privity with its said surety.
When it is said that a judgment binds parties and privies, the reference is, generally speaking, to privies in law and not to a privity by contract or deed. The plaintiff was not a party to the Pennsylvania case and was the principal in the bond there sued upon, and therefore the relation between these parties was that of principal and surety, which relation was created by contract. “ If there be any privity between them it is that of contract, which is not admitted to be sufficient by any court or authority whatever.” Masser v. Strickland, 17 Sarg. & Rawle, Pa., 359. In that case it was distinctly ruled that whilst a judgment against a constable for official misconduct is conclusive against his sureties as to the *58 misconduct and quantum of damages, it is not res judicata against the sureties so far as preventing them interposing personal defenses.
In Brown v. Chaney, 1 Kelly, Ga., 410, is a careful analysis of the question wherein the court defines privies to be—
“those who are so connected with the parties in estate or in blood or in law as to be identified with them in interest and consequently to be affected with them by the litigation, as lessor and lessee, heir and ancestor, executor and testator; all others not included in either of these classes are, of course, strangers,”—
and consequently the court declined to apply the rule of res judicata in a case where the indorser was sued and who attempted to rely upon a prior judgment in favor of one of the makers. After discussing the authorities and pointing out that a judgment against the principal (there being no fraud or collusion shown) may be frima facie evidence of the amount of the damages, the court thus concludes:
“ But to hold that a judgment is conclusive upon third persons would be to overturn a uniform course of decisions from the Year Books to the present day.”
In Douglass v. Howland, 24 Wend., 35, the court discusses the meaning of privity in reference to parties to a cause, collates the authorities upon the effect of a decree against the principal in a subsequent action against a guarantor, and adds:
“ It is admitted in the books cited that the verdict is not only evidence against the immediate parties, but against all claiming under them, which very nearly, expresses the meaning of the word privy when used to signify those persons off the record who may be affected to the same extent as if they were parties. It means anyone who takes the subject matter of litigation after the suit is determined or, in some cases, while it is pending. He is either privy in blood, as an heir on whom the estate in litigation descends; a privy in estate, as one who takes by conveyance; or a privy in law, as one who takes a right of dower. In all these cases the reason is obvious; the heir purchaser, etc., always comes in subject to any act or default of the predecessor by which the title may have been affected. But, subject to this exception, the law .is extremely jealous of the rights of all who *59 are not actual parties, even though, they may appear and be made so.”
“Privity denotes mutual or successive relationship to the same rights of property, or, as is said in Bigelow on Estop., p. 142, the * ground of privity is property and not personal relation.’ ” The Stanwood, 19 Fed., 577.
“A privy to a judgment or decree is one whose succession to the rights of property thereby affected occurred after the institution of the particular suit and from a party thereto.” Orthwein v. Thomas, 127 Ill., 554; 11 Am. St. R., 159, 171.
Defining the term privity, the court in Gittinan v. Strong, 14 P. F. Smith, Pa., 246, says:
“ It is the right to represent which creates privity in law as between ancestor and heir, decedent and administrator, etc., but clearly the principal in an action against himself alone can not represent the surety.”
And further:
“The privity of the surety with his principal is in the contract alone and not in the action.”
To the same effect is Park v. Ensign, 66 Kans., 50, 97 Am. St. R., 352, and cases there cited; Hartley v. Phillips, 198 Pa. St., 9; Pennington v. Hunt, 20 Fed., 195; City of Lowell v. Parker, 51 Mass., 309, 315; Morris v. Lucas, 8 Blachf. Ind., 9; 1 Freem. Judgts., sec., 162; Wells Res Judicata, sec. 87 et seq., and other cases supra.
The authorities we have cited are sufficient to establish the proposition that the plaintiff company and its surety were .not privies in such sort that the judgment of the Federal court in Pennsylvania in favor of the plaintiff’s surety will warrant it in setting up said judgment as res judicata in this action wherein it is suing for damages for an alleged breach of the contract between it and the United States. And upon principle it can not be claimed that because a fact was in issue in an action against the surety the opposite party is concluded by the judgment therein when the principal is being sued, or when, as in this case, the principal seeks to take advantage of a judgment in its surety’s favor.
The relationship existing between principal and surety is well understood in the law. As affects the obligee, they may both or either be bound, but as between themselves one *60 is primarily and the other secondarily bound. The surety is allowed to interpose defenses which are not available to the principal. Their interests are not always identical, Gittinan v. Strong, 64 Pa. St., 246. The principal obligor and the obligee may agree to a valid extension of the bond or of the time in which a contract is to be performed, but if the surety does not agree to such extension he will be released. The principal may agree to an alteration of material parts of the contract and remain bound, but the surety, not consenting, may be such changes be released. The surety’s undertaking in the present case was that the claimant would do certain work under the contract between the parties, and was not that the surety would do the work. The rights of the United States are therefore based both upon the contract and the bond.
When a judgment rendered against the principal is admissible against the surety in a subsequent action by the creditor against the surety, it is not admitted upon any theory of privity, but as a link in the proof of a case against the surety, and ascertaining as it does the liability of the principal it may fix the quantum of damages for which the surety is answerable. But it does not preclude the surety from making personal defenses. Douglas v. Howland, 24 Wend., 35 As was said in Deck v. Johnson, 30 Barb., 283, 290:
“A judgment in favor of a surety against the condition in a separate action by the latter against the former would not affect the rights of the condition against the principal debtor, because such a judgment would not necessarily extinguish the debt, and such principal debtor would be neither party nor privy to the action.”
It is allowable, where material and where the pleadings do not sufficiently show it, to prove by extrinsic evidence consistent with the record that a certain fact, right, or question was litigated in a cause between parties in a prior action, Miles v. Caldwell, 69 U. S., 35; Fendall's case, 14 C. Cls., 247, and claimant has introduced herein depositions given by witnesses in the said suit in Pennsylvania. We agree with counsel for plaintiff that the pleadings in said cause taken in connection with the charge of the court *61 therein show sufficiently the questions at issue, and whilst we do not exclude the testimony offered for said- purpose, we take occasion to say that the method adopted for making such proof is not the approved practice, but the fact, right, or issue sought to be proven must be shown by evidence relating thereto and not by the testimony adduced at the hearing of the case, because it unnecessarily encumbers a record to bring into it the testimony of witnesses in another proceeding much of which is immaterial upon the matter sought to be proven.
It is unnecessary for us to discuss the Pennsylvania case, because, as has been stated, we hold that the judgment there is not conclusive upon the defendants to this suit.
Plaintiff’s second contention is that the United States were not justified in annulling the contract for plaintiff’s failure to comply with its terms, because of an alleged change of the site upon which the buildings were proposed to be erected. The contract contains the following provision with respect of annulment:
“ If said parties of the first part shall fail in any respect to perform this contract on their part, it may, at the option of the United States, be declared null and void, without prejudice to the rights of the United States to recover the defaults herein or violations hereof, and that for such default the United States may demand and recover of said parties of the first part and their representatives aforesaid as liquidated damages a sum of money equal to the penalty of the bond forming part of this contract.”
Section 8 of the specifications, which also authorizes the annulment of the contract should certain conditions arise, is in the following words:
“If at the close of any month the progress of the work shall not have been such as to indicate that it will be completed within the time specified in the contract, the officer in charge of the work shall so report to the commandant, and the Government shall have the power to refer the matter to a board of three officers, and if recommended by- them and the interests of the Government so require the Government shall have the right to annul the contract and complete the work in such manner as is deemed best at the expense of the contractor and his sureties.”
*62 Although plaintiff company contends that it was justified in refusing to comply with its contract because of an alleged change in the location of the site for the buildings, it is shown by Finding IY, when a prospective site was pointed out to a member of the plaintiff company by a Navy official, yet he was informed by said officer that the site for the buildings had not been definitely determined, and that the same could not be finally decided until such action was approved by the Navy Department. Hence it is definitely shown that the site inspected by prospective bidders was only tentative, and as shown by the findings had only been recommended by the local naval board, but that the matter had to be referred to the Navy Department for approval or disapproval. The same was accordingly referred and was disapproved by said department, and another and permanent site was definitely selected under the directions of the Navy Department, upon which the buildings were to be constructed.
Plaintiff company purchased certain materials and proceeded to the work of carrying out its contract; and not until May 10,1899, one hundred and forty days after signing the contract, as set forth in Finding X, was any objection raised or protest offered to carrying on the work at the site selected by the Navy Department.
The advertisement for bids was for the construction of certain buildings at the Mare Island Navy Yard. The contract which plaintiff company signed was for the construction of these buildings at said navy yard. If the contracting company based its proposal upon the theory that the buildings were to be constructed at a particular point in the navy yard, it should have demanded that the contract should so state at the time it was submitted to it for execution. The rule is elementary that all prior negotiations are merged in the written contract, and that such contract is presumed in law to express the final understanding of the parties signing it, and that prior understandings can only be referred to for the purpose of explaining and construing uncertain terms of the contract. Brawley’s case, 96 U. S., 168, 173. See also Simpson v. United States, 172 U. S., 372, 379; Griefen v. United States, 43 C. Cls., 107; Callahan Construction Co. v. United States, 47 C. Cls., 177.
*63 In the Simpson case, above cited, the contract was for the building of a dry dock upon an “ available ” site, and in that respect it is not materially different from the contract under consideration. As said by the Supreme Court, page 380:
“ The contract imposed upon the contractors the obligation to construct the dock according to the specifications within a designated time for an agreed price upon a site to be selected by the United States. We look in vain for any statement or agreement or even intimation that any warranty, express or implied, in favor of the contractors was entered into concerning the character of the underlying soil.”
The contention in the case at bar that a certain site had been selected is not sustained by the findings of fact, and it is certain that no sort of test had been made of the soil underlying the location as first recommended or the location as secondly recommended. In the Simpson case it appeared that a test had been made, and it was insisted that the contractors were influenced in making their bids by that test, but the Supreme Court said, page 381:
“ The fact that the bidders knew that a test of the soil in the yard had been made, and drew the contract providing that the dock should be located on a site to be designated by the United States without any express, stipulation that there was a warranty in their favor that the ground selected should be of a defined character, precludes the conception that the terms of the contract imposed such.obligation on the Government in the absence of a full and clear expression to that effect, or at least an unavoidable implication.”
The plaintiff company after making the contract, and as early as January 19,1899, seems to have known, regardless of its claim to the contrary, that there was to be a change in the location of the buildings, because at that time its president stated:
“As soon as you are able to notify us that the changed location of the buildings has been definitely fixed we will immediately commence work on the foundation.”
And thereafter, on March 1st, a formal notice was given to the plaintiff that the site of the sawmill had been selected and that the contractors were at liberty to start work as soon as they desired. They immediately replied that they were *64 pleased to learn that the site had been selected, and that work thereon would be commenced, adding:
“ In the meantime, will you kindly inform us whether the original site was finally decided upon, and if not, where the new location is ? ”
These statements are utterly inconsistent with the claim that the plaintiff company did not understand in the beginning of the negotiations that the site had not been definitely selected. This conclusion is fortified by the conduct of the plaintiff company in proceeding with arrangements for doing the work after the site had been selected and without complaint until some time in May following.
“ Light is thrown upon the plain meaning of the contract by the conduct of the parties in the execution of the work. It is not pretended that, when the character of the subsoil was discovered, the slightest claim was preferred that this factgave rise to an extra" allowance. The fact is that the contractors proceeded with the work, obtained delay for its completion, made their final settlements, and received their last payment without ever asserting that any rights which they now claim were vested in them. Without deciding that such conduct would be decisive if the claim was supported by the contract, it is nevertheless clear that it affords a just means of adding forceful significance to the unambiguous letter of the contract and the self-evident intention of the parties in entering into it.” Simpson’s case, supra.
The work was not done by plaintiff company in this case as in the Simpson case, but the principle stated in the quotation above is applicable here.
We allow nothing on account of the defendant’s counterclaim, because we think that the changes in the specifications made by .the subsequent contracts with Concannon resulted in material and substantial alterations in the work which claimant had undertaken to perform. In other-words, that the Government after notifying the claimant of its purpose to have the work done and hold claimant for the difference between what it would cost the defendants and the original contract price did not complete the work in substantial compliance with the original plans, but changed them in material features. The right secured by the original contract to make changes in the specifications and providing for a method of *65 ascertaining the compensation to be paid in event of changes should not be extended into the new arrangement so far as the rights of the original contractor are concerned. When the Government took over the work and let a new contract, its rights and those of the original contractor were fixed by the law applicable to the rights and liabilities then existing. The Government could then sue for a breach of the contract or could have the work done and charge the contractor for the cost in excess of the original contract price. But electing to do the latter the Government must show that the work was done by another contractor under a contract and specifications which did not materially or substantially depart from the old contract and specifications. To allow the Government under the provisions of the original contract or specifications the right to make material changes in the specifications, resulting in substantial alterations of the buildings as originally contemplated, would be in effect to say that any sort of changes or alterations could be made after the declared breach. Axman's case, 234 U. S., 36; McMullen's case, 222 U. S., 460; O'Brien's case, 220 U. S., 321.
Our conclusion is that judgment shall be entered in favor of the plaintiff company against the United States for the sum of $1,254.65, as shown by Finding XIY. All other claims, including the defendants’ counterclaim, are dismissed.
Howey, Judge, took no part in the trial and decision of this case.