**UNITED STATES of America,**
Plaintiff,

v.

**ELLIOTT TRUCK PARTS, Inc.,**
Defendant.

Civ. A. No. 14870.

United States District Court
E. D. Michigan, S. D.

Feb. 18, 1957.

Fred W. Kaess, U. S. Atty., Rodney C. Kropf, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Charles A. Bryan, Detroit, Mich., for defendant.

PICARD, District Judge.

Action by plaintiff to recover excess costs allegedly suffered and resulting from defendant's breach of three contracts. Execution of the contracts and failure to perform is admitted but defendant contends failure justified and that plaintiff has not suffered damages alleged.

Parties have submitted exhibits and a stipulation.

### Findings of Fact

On June 20, 1950 plaintiff awarded defendant, as low competitive bidder, three contracts numbered 8373, 8434 and 8549 providing for delivery of items described therein (154 truck axles and 1,881 propeller shafts) within 120 to 180 days for a total price of $133,419.40. Other pertinent provisions of these contracts are:

"11. Default

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the contractor. Such causes include, but are not restricted to, acts of God or the public enemy, acts of the government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

"(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

"12. Disputes

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Sec-

retary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive * * * "

By February 9, 1951, defendant Elliott was in default on all three contracts and plaintiff Government, through its Contracting Officer, gave notice of its intention "to terminate" unless Elliott either

(a) performed within ten days or

(b) made showing that failure to perform was without fault or negligence.

To this Elliott made no reply and on March 15, 1951, the contracts were terminated. In its notice to defendant plaintiff informed defendant that it had been determined that failure to make delivery was not attributable to any of the causes specified in Section 11(b) supra and that the Government intended to hold defendant liable for any damages or excess costs sustained in securing the contracted for truck axles and propeller shafts from others.

On May 18, 1951, after Elliott had received the above notice it informed plaintiff's "Contracting Officer" that it, Elliott, had arranged to deliver 87 axles (contract 8373) 40 units being then at Ben's Truck Parts, Tacoma, Washington, 20 at Mutual Truck Parts, Chicago, Illinois and the remainder at a location not specifically stated. Upon investigation plaintiff learned—

(a) that while Mutual Truck Parts denied having offered to sell any units to defendant Elliott, it had agreed to sell 20 of them to "Elliott's President", claiming to be unaware of the fact that he represented defendant. However, since defendant had represented that it was "to make delivery" plaintiff's agents made no attempt to purchase the axles directly from Mutual; and

(b) that of the 40 axles allegedly available at Tacoma 36 had already been sold and shipped to Portland, Oregon and the four remaining were rejected because of possible defects. Plaintiff was also informed that seller refused to crate the axles it still had in preparation for shipment.

There was no delivery of any kind made by Elliott and so the Government relet the contracts as follows: 8373, May 31; 8549, June 1; and 8434, August 22, all in 1951. Inserted therein was a provision that the equipment (axles and shafts) must be located in the United States and available for inspection.

The original contracts did not contain this provision, a point stressed by defendant, plus the admitted fact that the provision greatly enhanced the price under the relet contracts. We find nevertheless that such provision, limiting the source of supply to the continental United States, was consistent with the policy of the Government against importation of surplus property.[1]

Accordingly, plaintiff's Contracting Officer, having determined that the cost to plaintiff Government of securing the equipment from others totals $45,680.23 in excess of the amount for which Elliott

[1] At the time the Federal Property and Administrative Services Act of 1949 was in effect, 63 Stat. 377, and section 402 of Title IV [now 40 U.S.C.A. § 512] dealing with Foreign Surplus Property provided no such property should be disposed of except upon a condition forbidding its importation into the United States unless the Secretary of Agriculture in case of any agricultural commodity, or the Secretary of Commerce in case of any other property, determines that the importation of such property would relieve domestic shortages or otherwise benefit the economy of this country.

In addition on March 14, 1951, the Secretary of the Army requested the government of Germany through the United States High Commissioner to freeze all surplus property in order to prevent importation. See Part I "Hearings Before A Subcommittee of The Committee on Expenditures In The Executive Departments, Eighty-Second Congress, First Session, P 60," held on March 5, 15, 16, April 4, 12, 13, 17, 19, 23, July 18, August 9 and 16, 1951.

had promised to perform, assessed damages against the latter in this amount.

Defendant Elliott then appealed, both as to the "assessment" of damages and the "finding" that Elliott's failure to perform was inexcusable on the theory that:

(a) defendant's failure to perform was excusable under section 11(b) of the contracts because plaintiff government had prevented performance by freezing all surplus property in Europe knowing that this was defendant's source of supply;

(b) the Government could not hold defendant liable for damages or excess costs since those relet contracts differed in a material respect from the original ones, to-wit: bids were unacceptable unless property was located in the United States; and

(c) the Government acted unreasonably in refusing to purchase the 87 axles after defendant had informed the Government agents of the location of these items.

Pursuant to this appeal testimony was taken before a hearing officer and on October 24, 1952, the Armed Services Board of Contract Appeals decided all issues adversely to defendant and affirmed the Contracting Officer.

### Conclusions of Law

■ Defendant's attempt to use as a defense for failure to perform the fact that bidders were limited to persons who had the property located in the United States is, in the opinion of this court, without basis either in fact or law. See Exhibit 16 and note 1, supra.

First, the "freeze" was not the act of United States, but that of the German Government at the request of the former. But this was an act of "sovereignty" caused by the Korean situation;

Second, the "freeze" did not render performance by Elliott impossible, but only less profitable and more difficult. The best proof of this is that plaintiff eventually relet the contracts to other firms who furnished like or similar equipment within the limitation; and

■ Third, the term "act of the Government" specified in the contracts as good reason for failure to perform or liability for excess costs must be construed to mean acts committed "as a contractor." See Sunswick Corporation of Delaware v. United States, 109 Ct.Cl. 772, 75 F.Supp. 221, but compare this case with Geo. H. Evans & Co. v. United States, D.C., 74 F.Supp. 58. In Horowitz v. United States, 267 U.S. 458 at page 461, 45 S.Ct. 344, 69 L.Ed. 736, the Supreme Court said:

"It has long been held by the Court of Claims that the United States when sued as a contractor *cannot be held liable* for an obstruction to the performance of the particular contract resulting from its public and general acts *as a sovereign.* Deming v. United States, 1 Ct.Cl. 190, 191; Jones v. United States, 1 Ct.Cl. 383, 384; Wilson v. United States, 11 Ct.Cl. 513, 520. In the Jones case supra, the court said: 'The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendant.'" (Emphasis ours.)

■ Next as to defendant's second contention, to-wit: that because the relet contracts limited the source of supply to the United States, while the original contracts contained no such limitation, the former may not be used to measure damages or excess costs. Defendant draws hope from United States v. Ax-

man, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198, where the Supreme Court held that after the original contractor has been defaulted and the contract relet, the defaulted contractor is not bound for the difference between costs of performances unless the contract as relet is the same as the original contract. See also Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130.

But close examination reveals a very material difference in the facts. In the case at bar, paragraph 11(c) of the contracts involved provides that if the government should terminate the contracts pursuant to section 11(a), then it

"may procure, *upon such terms and in such manner as the Contracting Officer may deem appropriate,* supplies or services similar to those so terminated." (Emphasis ours.)

The contracts in the Axman and Doehler Metal Furniture Co. cases contained no such provision. Thus in the case at bar, the parties unlike the Axman and Doehler cases, supra

"not only contemplated some variation from the original contract, but vested a broad discretion in the Contracting Officer." United States v. Warsaw Elevator Co., 2 Cir., 213 F.2d 517, 518.

Having thus given the Contracting Officer discretion by the terms of the contracts, defendant cannot avoid liability unless it can be shown that there has been "an abuse of the discretion" so granted. Here, the burden of proof is on defendant. U. S. v. Warsaw Elevator Co., supra.

In view of all the circumstances we are compelled to find as a matter of law that there has been no abuse of the discretion granted.

First, it is not true as implied by defendant that, at the time it entered into the contracts with plaintiff, surplus property could be imported without any restriction. On the contrary at the time the contracts were let an Act of Congress was in effect which provided that all surplus property disposed of subsequent to 1949 must be upon the condition that it would not be imported into the United States unless the Secretary of Commerce or Agriculture should first determine that it would be beneficial to the economy of this country. See Section 402 of the Federal Property and Administrative Service Act of 1949, 63 Stat. 377, p. 398.

Second, shortly before the contracts were relet, not only had the Secretary of the Army requested that the "freeze" on surplus property be reinstated[2] but the House of Representatives' Committee on Expenditures in the Executive Department was conducting an investigation of the importation and resale of surplus property in the United States. Members of that committee expressed grave concern because large quantities of surplus property were being imported and resold to government agencies at possible great expense to the American taxpayer.[3]

So it must be conceded that the Contracting Officer only followed the law of the land when he restricted the source of supply under the relet contracts to the continental limits of the United States, to prevent further importation of surplus property.

All that remains is defendant's contention that the government acted un-

---

2. See Statement of Hon. Frank Pace before the Committee on March 15, 1951. See pages 59–60 of Hearings, Exhibit 16.

3. Representative Lantaff of Florida, a member of the Sub-Committee said on page 68 of Exhibit 16:
   "I know you are not familiar with the details of this, but the subcommittee has information that one dealer in California imported some 200 vehicles and sold a great number of them to the Atomic Energy Commission. Dealers testified that they are bringing in from STEG, through Dawson, a great number of axles, and that many of those axles are being sold to the Detroit Tank Arsenal and the various prime contractors and subcontractors of that arsenal. So, we have information which shows that this material is being brought back under the theory that it is in short supply in this country, and sold back to the Army and other interested defense agencies. That is what we want to stop while looking into this problem."
   See also page 65.

reasonably in failing to purchase the 87 axles from sources specifically designated by Elliott as available. As to all but the 20 axles found at Mutual Truck Parts we reject this contention for the same reasons given by the Armed Service Board of Appeals. (See pages 3 and 4 of its October 24, 1952 opinion.) The evidence shows that the government investigated the alleged sources of supply and discovered in both instances that the axles were not available or were not suitable.

We hold, however, that plaintiff's failure to take the axles at Motor Truck Parts, chiefly because they had been sold to "defendant's president" and not "defendant" is specious reasoning. Plaintiff had a duty to mitigate damages. American Casualty Company of Reading, Pa. v. Glorfield, 9 Cir., 216 F.2d 250, at page 253. It did not find these axles faulty or not suitable. And to refuse to accept the axles for the reason given was picayune. It is to be hoped that this government has not reached that level where it must resort to flimsy excuses in order to punish some defaulting contractor.

Plaintiff is entitled to judgment in the amount claimed as herein modified.