**CONSOLIDATED AIRBORNE SYSTEMS, INC.**

v.

**The UNITED STATES.**

No. 389–61.

United States Court of Claims.
July 16, 1965.

A. Hogenson with directions to make his recommendation for conclusion of law on plaintiff's motion and defendant's cross-motion for summary judgment. The commissioner has done so in an opinion filed April 12, 1965, wherein he recommended that plaintiff's motion for summary judgment be denied, defendant's cross-motion for summary judgment be allowed as to the petition but denied as to the counterclaim and that plaintiff's petition and defendant's counterclaim be dismissed. It appears to the court that neither party has filed a request for review pursuant to Rule 55(b), that the time for so doing has expired, and that on May 18, 1965, the defendant filed a motion for adoption of the commissioner's opinion and recommended conclusion of law. Since the court is in agreement with the recommendation of the trial commissioner and opinion, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover on its petition and defendant is not entitled to recover on its counterclaim. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is allowed as to the petition but denied as to the counterclaim, defendant's motion to adopt the commissioner's opinion and recommended conclusion of law is allowed and the petition and counterclaim are dismissed.

## OPINION OF COMMISSIONER

This is a suit on a bid contract awarded by defendant's Aviation Supply Office, Department of the Navy, to plaintiff on June 27, 1958, designated Contract No. N383 (383–MIS) 54267A, pursuant to which plaintiff, a New York corporation, undertook to manufacture and deliver 467 units of electronic equipment called Test Bench Cable Kits at a unit price of $362, and a subordinate item for $450, for a total contract price of $169,504. The invitation for bids and contract divided the 467 items into two lots, Lot I being 267 items intended for Navy use, and Lot II being 200 items for the Army Signal Corps. As re-

Hyman J. Cohen, Washington, D. C., for plaintiff. Norman Jacobson, New York City, of counsel.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 54(b) to Trial Commissioner Roald

quired by the invitation, plaintiff's bid was submitted on the total contract quantity, not as a separate bid on each lot. Plaintiff was required to submit to defendant for testing one preproduction sample of the contract item prior to the commencement of production and within 120 days after the contract award, and to make deliveries of the 467 items in quantities and intervals set forth in a contract schedule within a period of from 300 to 420 days after such contract award. As provided by the invitation and contract, the defendant was allowed 60 days after submission of the preproduction sample, within which to notify plaintiff whether such sample was approved, or plaintiff would be entitled to extensions of delivery dates by the number of days by which such notification was delayed.

On October 15, 1958, defendant's contracting officer on plaintiff's application extended the time for submission of the preproduction sample from 120 to 210 days provided that such extension would not affect delivery of the contract items. Plaintiff failed to fabricate and deliver the preproduction sample or commence production of any of the contract items. By written notice to plaintiff, dated January 26, 1959, the contracting officer after a preliminary warning dated December 16, 1958, terminated the contract for plaintiff's default, finding that plaintiff had failed to make progress so as to endanger performance of the contract. Plaintiff was advised that the contract items would be procured on the open market against its account and that plaintiff would be held liable for any excess costs.

Defendant thereafter awarded a reprocurement contract to Avionics Corporation of America for the same equipment but for a quantity of only 267 units. The reduction from 467 units resulted from advice from the Army Signal Corps that its 200 units were no longer required. Avionics' total contract price on 267 units at a unit price of $697.47 was $186,224.49, less an allowable discount of 1 percent, or the net amount of $184,362.25.

By letter dated July 2, 1959, the contracting officer requested payment by plaintiff of the excess costs of reprocurement in the amount of $88,191.52, presenting a computation of the net repurchase contract price of $184,362.25 (as stated above), and deducting therefrom $96,170.73, computed as plaintiff's unit price of $362 applied to 267 units for $96,654, less an allowable discount of 0.5 percent.

Plaintiff took timely appeals on both actions of the contracting officer, and the issues on the termination of the contract for default and the assessment of excess costs of reprocurement were heard and decided by the Armed Services Board of Contract Appeals, pursuant to the standard Disputes article of the contract (ASBCA Docket No. 5498).

The record of the trial *de novo* held in this case has been abandoned by the parties. See Stein Bros. Mfg. Co. v. United States, Ct.Cl. No. 389–59, decided July 12, 1963, 337 F.2d 861. After such trial, they presented and filed their motions for summary judgment and briefs on the theory that the decision of the Supreme Court in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L. Ed.2d 652 (1963), was applicable to this case, and that this court is limited to a review of the administrative record to test the finality of the Board's decision on questions of fact. It is undisputed that the Board's decision is not accorded finality on questions of law. 41 U.S.C. § 322. Accordingly, this opinion and recommended conclusion of law are based solely upon consideration of the administrative record, applying the test as to the finality of the Board's findings of fact as provided in 41 U.S.C. § 321, but with independent consideration of the law applicable to the established facts.

It is my opinion that plaintiff's motion should be denied, that defendant's motion be granted as to plaintiff's petition but denied as to the counterclaim, and that plaintiff's petition and defendant's counterclaim should be dismissed.

By its Findings of Fact and Decision, dated January 31, 1961, the Board found

and decided that plaintiff's failure to perform did not result from excusable causes, but that the Government action in substantially decreasing the repurchase quantity of contract items was prejudicial to plaintiff to the extent that it reculted in an increase in the repurchase unit price, that such increase was measurable and not properly includable in the computation of excess costs, and the correct amount of excess costs was $58,462.-32. Plaintiff's motion for reconsideration was denied by the Board on April 14, 1961.

Thereafter, defendant demanded payment by plaintiff of the $58,462.32 plus interest at 5 percent from May 5, 1960, and plaintiff paid the demanded amount plus interest thereon, or a total of $61,-596.56. The parties then agreed that such payment was without prejudice to plaintiff's right to proceed in this court.

By its petition herein, plaintiff seeks recovery of $61,596.56 with interest. By its counterclaim, defendant seeks $29,-729.20, the difference between the contracting officer's assessment of $88,191.52 and the $58,462.32 of excess costs found by the Board, plus interest.

Subparagraph (a) of the standard Default article of the contract provides that the Government may terminate the contract if the contractor fails to perform any of the provisions of the contract, or so fails to make progress as to endanger performance of the contract in accordance with its terms. Subparagraphs (b) and (c) provide as follows:

(b) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services: *Provided*, That the Contractor shall continue the performance of this contract to the extent

not terminated under the provisions of this clause.

(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

It is undisputed in this case that plaintiff failed to perform the contract and that the contracting officer properly terminated for default.

Plaintiff contends, however, and defendant denies, that the above-quoted subparagraph (c) of the Default article relieved plaintiff of any liability for excess costs in that its failure to perform arose out of causes beyond its control and without its fault or negligence.

In the preparation and submission of its bid, plaintiff relied upon the written quotation of a prospective subcontractor, General Products Engineering Company, to fabricate and supply plaintiff the 11 items of metal parts required for each unit of the 467 Test Bench Cable Kits at

a price of $85 per unit. Plaintiff knew that General Products had supplied such metal parts to Avionics under a previous Government contract. After plaintiff was awarded the contract, plaintiff informed General Products that it would soon submit a purchase order. This proposed supplier then withdrew its $85 quotation, and advised plaintiff that such price was based upon its undisclosed expectation that it would concurrently receive an order from Avionics for about 600 sets of the same parts, which order had not materialized. General Products then proposed to supply plaintiff with such parts at a price of $182.30 per set. This represented an increase of $45,439.10 in plaintiff's costs on the 467 units. In its bid, plaintiff allowed $30 of the unit price of $362 as profit, or the total sum of $14,010 on the 467 units. On this basis, plaintiff stood to lose $31,429.10 on the contract performance, and plaintiff rejected the revised quotation on the assertion that bankruptcy would result.

During the next few months plaintiff attempted to procure the metal parts from other companies. On September 2, 1958, it received a quotation of $157.29 per set from Stellar Tool Company. Plaintiff did not accept this quotation because it would have increased the costs of contract performance by $33,760. Furthermore, plaintiff believed that Stellar lacked the experience necessary to perform. On September 10, 1958, plaintiff received a quotation from Clyde W. Briggs, Inc. of $93.12 for fabrication of 10 of the 11 parts, excluding the metal cradle. On September 4, 1958, Samco Mfg., Inc. had submitted an unsolicited offer to plaintiff to supply the cradle for $39.80 each on the basis of 1,000 units.

On September 30, 1958, plaintiff notified the defendant's contracting officer in writing that receipt of final quotations from its suppliers indicated an increase of $100 in the cost of production of each unit and that the resultant loss of $46,700 would be catastrophic and eventually put plaintiff out of business.

Plaintiff challenges the Board's conclusion that it was "not convinced" that plaintiff "lacked working capital to perform the contract." Plaintiff was a small business concern organized only a year prior to the contract award. As of April 30, 1958, its total assets were $94,500, of which $75,680 represented capitalization of so-called research and development expenses. Plaintiff's liabilities at that time totaled $105,500, leaving a deficit of about $11,000 for the first period of its operations. By November 30, 1958, plaintiff's assets had increased to $162,800, which included $83,600 in research and development account and $40,000 in accounts receivable assigned to its bank. Plaintiff's total liabilities were then $142,100, of which $24,300 were notes payable to its bank, secured by the above-mentioned assignments.

These facts suggest that plaintiff was not in good financial condition to undertake performance of the subject contract in the face of the loss which would result from the failure and refusal of General Products to supply the 11 metal parts at its originally quoted price. The evidence in the Board's record, however, is vague and indefinite as to the extent to which plaintiff could or could not have obtained further bank financing or other capital funds which would have enabled plaintiff to perform. It cannot be found from a consideration of the entire administrative record that the Board's statement that it was not convinced that plaintiff lacked working capital to perform the contract is "capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321.

However, it may be assumed, *arguendo*, that plaintiff's financial condition was such that attempted performance of the contract would have rendered plaintiff hopelessly insolvent, or even an adjudicated bankrupt, but plaintiff as a matter of law is not excused from the default in the contract performance. Actual bankruptcy, *a fortiori* the mere possibility or threat of same, is no excuse for nonperformance under the above-quoted Default article, and does not relieve plaintiff of liability for excess costs

of reprocurement. Under the rule of *ejusdem generis,* the general words "causes beyond the control and without the fault or negligence of the Contractor" are limited in meaning by the particular words to things of the same kind or class of extraneous circumstances enumerated in such article, i. e., acts of God, etc. Austin Co. v. United States, 161 Ct.Cl. 76, 80, 314 F.2d 518, 520 (1963), cert. denied 375 U.S. 830, 84 S.Ct. 75, 11 L. Ed.2d 62. Under the same rule, bankruptcy, insolvency or undercapitalization cannot be considered as causes for nonperformance beyond the control and without the fault or negligence of the contractor. Willems Industries, Inc. v. United States, 155 Ct.Cl. 360, 372, 295 F.2d 822, 829 (1961), cert. denied 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400. Indeed, the very essence of a promise to deliver articles is the ability to procure or make them. Carnegie Steel Co. v. United States, 240 U.S. 156, 164, 36 S. Ct. 342, 60 L.Ed. 576 (1916). It must be deemed an implied term of every contract that the promisor will not permit himself, through insolvency or bankruptcy, much less the threat of the same, to be disabled from making performance, and in this view, bankruptcy or insolvency is but the natural and legal consequence of something done or omitted to be done by the bankrupt or insolvent. Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 591, 36 S.Ct. 412, 60 L.Ed. 811 (1916); Pennsylvania Exchange Bank v. United States, 145 Ct.Cl. 216, 223, 170 F.Supp. 629, 632 (1959); Kennedy v. United States, Ct.Cl. No. 425–55, decided February 14, 1964, slip op. p. 7; Whitlock Corp. v. United States, 141 Ct.Cl. 758, 763, 159 F.Supp. 602, 606 (1958), cert. denied 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58. In Zoda v. United States, 148 Ct.Cl. 49, 52, 56, 180 F.Supp. 419, 421, 424 (1960), defendant's termination for default was sustained against plaintiff's proffered reason that financial difficulties prevented commencement of production because contract material costs alone had risen during the Korean War to $170 per unit,

almost the total unit price of $174. See H & H Mfg. Co. v. United States, Ct.Cl. No. 77–60, decided December 11, 1964, slip op. p. 5.

Plaintiff further contends, however, that even if the threatened financial reverses did not excuse plaintiff from default of contract performance, the articles obtained by defendant under the repurchase contract were not "supplies or services similar to those so terminated," as required by the above-quoted subparagraph (b) of the Default article, and that consequently by the very terms of the article, excess costs on the alleged reprocurement could not on a contractual basis be charged to plaintiff. Plaintiff's contention on dissimilarity is based solely upon the above-described reduction in quantity, that is, from the original quantity of 467 units to the repurchased quantity of 267. The articles repurchased were "similar" to those called for in the subject contract in all characteristics except quantity of the units.

The evidence before the Board is clear that the increase in unit price from $362 in the original contract to $697.47 in the repurchase contract was primarily due to the fact that the original quantity of 467 units was almost halved by the cancellation by the Signal Corps of its requisition of 200 units. However, it is also clear that a substantial part of such increase was due to plaintiff's reliance in bidding upon the subsequently repudiated quotation of its prospective supplier of metal parts, whose capacity to supply such parts was unquestioned, although at more than double its original price.

The above-quoted subparagraph (b) of the Default article provides that upon termination for default, "the Government may procure, *upon such terms and in such manner as the Contracting Officer may deem appropriate,* supplies or services *similar* to those so terminated, and the Contractor shall be liable for any excess costs for such *similar* supplies or services." [Emphasis added.]

In this case, the defendant's procuring agent chose to obtain the same article in a quantity of 267 units rather

than the 467 called for in the subject contract, and he chose to negotiate the repurchase contract with Avionics rather than advertise for bids. As found by the Board on the basis of substantial evidence in its record, he acted reasonably in these respects. Termination of the subject contract occurred January 26, 1959. Defendant took steps to obtain the repurchase shortly thereafter. The Signal Corps then advised that it no longer had need for its 200 units, but the Navy advised that it was in short supply and requested expeditious reprocurement of its 267 units. Avionics was the only firm which had previously manufactured the contract article. Defendant's purchasing agent reasonably decided to save the time necessary for advertising and evaluation of bids and also the 6 months which would be required for submission and inspection of a sample contract article prior to commencement of production, and accordingly, he negotiated the repurchase contract with Avionics, without any provision for a preproduction model. His action in negotiating only with Avionics is sustained as a reasonable exercise of contract right. H & H Mfg. Co. v. United States, supra, slip op. p. 9; Lester Brothers, Inc. v. United States, 151 Ct. Cl. 536, 539 (1960).

Also supported by substantial evidence in its record are the Board's findings that defendant's procuring agent acted with reasonable expedition in awarding the repurchase contract on June 30, 1959, 5 months after the termination for default, and that the repurchase price of $697.47 per unit for 267 units was reasonable under the circumstances of this case. On March 16, 1959, Avionics submitted its cost analysis in support of its bid of $702.22 per unit for 267 units. Some time before the execution of the subject contract, Avionics had fabricated and delivered to the Navy 239 kits at a unit price of $504.50. Later, this company bid $585 per unit for the 467 kits called for under the subject contract. As support for its bid of $702.22 per unit on the repurchase contract, Avionics supplied the Navy with a cost analysis of the pro-duction of the 239 kits showing that without profit its costs had been $642.07 per unit. By adding 8 percent for profit to this figure and an allowance for freight, Avionics reached its unit price of $702.22. The Navy then sent an inspector into Avionics' plant to check the reasonableness of the cost breakdown, and his report and the analysis of a Navy cost accountant were submitted to the procuring agent, after consideration and approval by the Board of Review of the Aviation Supply Office. After a minor reduction of $4.75 agreed to by Avionics during the cost inspection stage, the cost breakdown was accepted by the procuring agent on the basis of the Navy investigations and review. The procuring agent was concerned about the financial ability of Avionics to perform, and awaited approval of Avionics' pending application to the Small Business Administration for a loan, after which he awarded the repurchase contract to Avionics on June 30, 1959.

Substantial and material differences in the physical characteristics of supplies repurchased, as contrasted with those specified in a defaulted contract, have been repeatedly held to be such a material deviation as to render the defaulting contractor not liable in accordance with contract terms for excess costs incurred in the repurchase of allegedly "similar" supplies. Thus, a defaulting contractor was held not liable for excess costs incurred in reletting of contracts for cotton goods when such cloth was manufactured by the new contractor in accordance with repurchase specifications requiring weight, texture, and tensile strength substantially different from the original specifications. Rosenberg v. United States, 76 Ct.Cl. 662, 679 (1933). The excess costs of repurchasing cotton waste were properly assessed against the defaulting contractor as to the repurchased goods which were substantially the same as those specified in the original contract, but not as to those of a superior grade containing a higher percentage of white threads. Patrick Corr & Sons v. United States, 55 Ct.Cl. 7, 27–31 (1919). A de-

faulting contractor was held not liable to the Government for excess cost of relet contract construction work when the relet specifications were materially different and resulted in substantial alterations of the buildings as originally contemplated. California Bridge & Construction Co. v. United States, 50 Ct.Cl. 40, 64–65 (1915), aff'd, 245 U.S. 337, 344, 38 S.Ct. 91, 62 L.Ed. 332 (1917). Cf. United States v. Axman, 234 U.S. 36, 42–45, 34 S.Ct. 732, 58 L.Ed. 1198 (1914). Assessment of excess costs was upheld on the basis that the quality of repurchased adhesive was "similar" to the supplies terminated. Associated Traders, Inc. v. United States, 144 Ct.Cl. 744, 751, 169 F.Supp. 502, 506 (1959).

■ Plaintiff's contention that "similar" supplies were not repurchased in this case is premised upon the argument that the reduction in quantity of kits is such a substantial change in the terms and conditions of the original contract that assessment of excess costs of repurchase should be disallowed as in the above-cited cases involving substantial changes in the physical characteristics of the supplies repurchased. Subparagraph (b) of the Default article authorizes reprocurement of similar articles "upon such terms and in such manner as the Contracting Officer may deem appropriate." Such a broad grant of discretion to defendant's contracting officer was in the contract involved in United States v. Warsaw Elevator Co., 213 F.2d 517, 519 (2d Cir. 1954) in which it was ruled:

* * * Under such a contract, liability for the loss the promisor [defaulting Government contractor] has caused should not be avoided except upon its showing of an abuse of the discretion it has granted and some new obligations in the relet contract going beyond the reasonable latitude accorded the promisee. So Warsaw had agreed to the procurement of merely "similar" supplies, thus pointing to the possibility of minor adjustments in the detail of armament specifications of the kind seemingly inevitable in a program of military procurement and perhaps as likely to lower as to raise costs. Having granted these wide powers to the government on its default, it must take the burden of showing that the variations actually adopted by the government Contracting Officer have caused unreasonable expense. In addition it should show the amount of such unjustified expenditure; a holding that its entire liability is expunged is to the last degree inequitable.

In its opinion, the Second Circuit Court of Appeals distinguishes its prior holding in Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir. 1945), on the basis of difference in contract language. Both the Sixth and the Tenth Circuits have adopted the rule of the Warsaw case. United States v. Elliott Truck Parts, Inc., 149 F.Supp. 52, 56 (E.D.Mich.1957), aff'd 261 F.2d 835 (6th Cir. 1958); Hoffmann v. United States, 276 F.2d 199, 201 (10th Cir. 1960).

It is concluded in this case that the reduction in quantity of the contract articles repurchased was a variation or deviation of contract terms within the contemplation of the parties in the broad grant of discretion to the contracting officer under the language of the Default article, that such discretion was reasonably exercised, and that the burden is on the plaintiff as defaulting contractor to show not only that such reduction in quantity caused unreasonable expense but also the amount by which the excess costs were increased by unjustified expense.

Under such rules, it must be recognized that if the evidence before the Board failed to establish that the excess costs were unreasonably increased by the reduction of contract units in the reprocurement, and also the extent of such unreasonable increase, then it would be necessary to conclude that plaintiff had failed to sustain its burden of proof and that the total excess costs of $88,191.52 assessed by the contracting officer should have been affirmed by the Board.

The Board, however, reasonably found on the basis of substantial evidence that "the Government's action of substantially reducing the quantity to be repurchased results in an increase in the unit price," and concluded that if such increase could be found, the excess costs should reasonably be reduced by that amount. With respect to its method of reassessment of excess costs, the Board stated as follows:

18. The record does not show the exact increment of price that may be attributable to the reduction of quantity. To hold, however, that Appellant's entire liability is expunged would be highly inequitable. [Citing by footnote Warsaw, supra] There are, in the record before us, certain facts which will enable us to determine with reasonable accuracy the amount of excess costs which should properly be assessed against Appellant. Avionics bid $585 per unit for 467 cable kits when the subject contract was given to Appellant. Its unit price was increased to $697.47 for 267 kits. Based on the admissions of the Government that the increase in unit price was "primarily due" to the decrease in quantity, it is our opinion, that the difference of $112.47 between these two prices reasonably represents the increase in the unit repurchase price that is attributable to the decrease in quantity. An adjustment of repurchase price accordingly reduces the repurchase price to $585.00 per unit. On this basis, we find that the excess cost of repurchase for which Appellant is properly liable is $58,462.32 computed as follows:

Replacement Contract
267 @ $585 (adjusted unit price) ......$156,195.00
Less 1% discount .................... 1,561.95    154,633.05

Subject Contract
267 @ $362 ......................... 96,654.00
Less ½% discount .................... 483.27    96,170.73
                                              $ 58,462.32

---

The Board's reassessment of excess costs of reprocurement was in conformity with law and supported by substantial evidence in its record of proceedings.