PENNSYLVANIA EXCHANGE BANK, Assignee, and Samuel H. Roseman, Assignee for the Benefit of Creditors of Joseph Lerner & Son, Inc.

v.

UNITED STATES.

No. 265-57.

United States Court of Claims.
March 4, 1959.

As Amended April 3, 1959.

Burton R. Thorman, Washington, D. C., for plaintiffs. Solomon Dimond, Washington, D. C., was on the briefs.

Clare E. Walker, New York City, with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

WHITAKER, Judge.

The Pennsylvania Exchange Bank and Samuel H. Roseman are assignees for the benefit of creditors of Joseph Lerner & Son, Inc. In this opinion we shall refer to Joseph Lerner & Son, Inc., as the plaintiff.

This suit is for the balance of the contract price withheld by defendant, because of plaintiff's alleged anticipatory breach of the contract by making an assignment for the benefit of its creditors. Defendant also counterclaims for damages for the breach. It is before us on cross-motions for summary judgment

and on assignees' motion to dismiss defendant's counterclaims.

As a part of its preparation for industrial mobilization in case of war, or the imminence of war, the Signal Corps of the Army promulgated "Procurement Specification No. 15", which envisaged the execution of "Industrial Preparedness Contracts." Such a contract was defined as "a mutual agreement between a contractor and the Government which requires the contractor to undertake realistic preparedness measures to improve his ability to produce the component part in the quantity specified in the contract."

■ Pursuant to the plan therein outlined, plaintiff on February 29, 1952, entered into a contract relative to the manufacture of "Microwave Magic Tees." The ultimate objective of this contract was to have ready, in case of war, a willing manufacturer, who had the facilities and was otherwise qualified, and who was ready to promptly produce microwave magic tees [1] in volume.

To accomplish this, the contractor obligated itself to do three things, called "steps". Step I required it to secure sufficient information about the manufacture of microwave magic tees, and to make such plans for the volume production of them as were necessary to secure "JAN Qualification Approval" as a manufacturer qualified to make the tees promptly and in the required volume. It also required the contractor, as a further demonstration of such ability, to make a pilot run, that is, to actually manufacture specified quantities of the elements required for these tees. The items to be manufactured were listed and the price to be paid therefor was specified, which price was supposed to reimburse the contractor for the cost of making them. The price specified in the contract proved insufficient to cover the manufacturer's cost and, hence, it was later increased sufficiently to do so.

Step II of the contract required the contractor to accomplish "all production processes short of procuring tooling and materials and short of actual volume manufacture of the articles." As a part of Step II the contractor was required to make a report to the Signal Corps of its plan of production and its capacity to produce. In doing so, it was to act "on the assumption that [it] will be required to produce 2,821 complete units in one year period, after activation of Step IV * * *." [2] The sum to be paid for the cost of performing this step was also set out in the contract.

Step III of the contract required the "acquisition of all additional tooling and manufacturing aids required to meet the Step II mobilization production schedule." These machines were acquired by plaintiff at a cost of $37,907.37.

All of this was in preparation for Step IV. This step, which was to be taken only in the case of a national emergency, and after receipt of an order from the Government, required "volume production in accordance with previously planned schedules."

After the completion of Steps I, II, and III, the plaintiff's obligation under the contract was to preserve the information acquired under Steps I and II, and to keep the machines acquired under Step III in operable condition. This obligation was to continue for a six-year period in anticipation of a national emergency.

For the performance of Steps I and II of the contract the Signal Corps agreed to pay plaintiff the sum of $117,-226.16, less a cash discount of one per cent for payment in 20 days. Under a price redetermination clause, this was in-

1. These tees are used to control the direction of the flow of an electrical impulse known as a microwave.

2. There was no agreement on the part of the Signal Corps to order any specified number of units from plaintiff, as defendant's counsel says on page 16 of its brief, inadvertently, we feel sure.

creased to $135,754.48, because plaintiff's costs exceeded the estimate.

By October 1, 1953, plaintiff had substantially performed all the requirements of Steps I, II, and III. The Government had made part payments of $92,843.12 for the performance of Steps I and II, and had reimbursed the plaintiff for all, except $1,922.23, of the cost of performance of Step III.

On October 1, 1953, a little over one and one-half years after the contract had been entered into, it became necessary for the plaintiff to make an assignment for the benefit of its creditors, in lieu of bankruptcy. The Pennsylvania Exchange Bank and Samuel H. Roseman, as assignees, sue now for the balance due under Steps I, II, and III of the plaintiff's contract.

The defendant refuses to pay the amount due under two alternative theories which it asserts in its pleadings. In its first counterclaim defendant maintains that Steps I, II, III and IV constitute an entire, indivisible contract, and thus plaintiff's incapacity to stand by to perform Step IV constitutes a total breach of the contract, and excuses defendant's performance. Defendant says also that it has been deprived of the benefits of its bargain, and it counterclaims for $92,843.12, the amount previously paid plaintiff, as damages.

In its second counterclaim the defendant asserts that the assignment for the benefit of creditors constituted a breach of plaintiff's duty to stand by to perform Step IV and that on account of it, it has been damaged in the sum of $85,858.63, which, it says, is the reasonable value of the six-year standby availability of plaintiff's manufacturing facility. Under this counterclaim, defendant concedes plaintiff's right to recover under the contract for its substantial performance of Steps I, II, and III, and it, therefore, deducts the amount due under those steps from its claim for $85,858.63, and asks judgment for $41,025.04, together with interest.

From the foregoing it is perceived that the issue before us is twofold. First, what was the purpose of the contract? Did the Government bargain for the performance of each step separately or did it seek all four steps as an entire, indivisible undertaking? Secondly, did the assignment for the benefit of creditors constitute a breach of the contract?

From the documents before us on these cross-motions, we do not doubt that the purpose of the Signal Corps in entering into the contract was to have available, in case of a national emergency, a manufacturer who had demonstrated its ability to promptly manufacture "magic tees" in the volume the Signal Corps thought it might need them, and who was willing to do so at a price to be agreed upon. This purpose was set out in section 1 of Procurement Specification 15, pursuant to which plaintiff's contract was entered into. This section reads:

"1. Scope.

"1.1. *Purpose*

"1.1.1. This specification covers industrial preparedness measures to be undertaken by manufacturers of the parts used in fabricating communications, electronics, and related equipments. These industrial preparedness measures are intended to prepare each contractor to manufacture specified component part(s) at specified rate(s) of production, in accordance with manufacturing methods and processes normally employed by that contractor in meeting the requirements of military specifications, and to reduce the time required for delivery of component parts that will be required in large quantities in the event of an emergency. It is not the intent to collect a mass of detailed information that could be passed to another contractor for adaptation to the manufacturing methods and processes of that contractor.

"1.1.2. Reports and other information procured under this specification will be used for industrial mobilization and preparedness planning, to provide a basis for deter-

mining whether or not production for military requirements can be accomplished or what additional planning measures are required."

This being the purpose, Steps I, II, and III were merely incidental to Step IV, which was the ultimate objective. The money spent to accomplish each of them was for the purpose of being ready to take Step IV, in case of need. It would not have been spent otherwise. Therefore, if plaintiff became incapable of taking Step IV, the purpose of the whole contract was thwarted. Plaintiff was fully aware of this when it entered into the contract.

From this it is seen that plaintiff's performance of Steps I, II, and III cannot be separated from its duty to stand by to perform Step IV. The duty to stand by and be ready to perform Step IV was the essential element of the bargain. The contract is not divisible.

We come then to the second issue presented: Did plaintiff's assignment for the benefit of creditors and the subsequent proceedings thereunder render it incapable of doing what it agreed to do, which was to stand by in readiness to produce magic tees in volume?

The contract specifications expressly bound plaintiff to do two things, in addition to Steps I, II, and III: it required it to keep in operable condition for a period of six years the tools necessary for the performance of Step IV, and to preserve for six years the data and information acquired in the performance of Steps I and II. This was required in order that Step IV might be taken. These were the only specific requirements imposed on the manufacturer, after Steps I, II, and III had been completed. It was implicit in the requirement, to keep records and tools ready for use, that this particular manufacturer be ready, willing and able to use them, because the last sentence of section 1.1.1 of Specification 15 reads:

"It is not the intent to collect a mass of detailed information that could be passed to another contrac-

tor for adaptation to the manufacturing methods and processes of that contractor."

The Signal Corps was preparing this particular manufacturer to be ready, willing and able to take Step IV if there was a national emergency within the six-year period.

In effect, the Government was bargaining for plaintiff's ability and readiness to produce over a six-year period. Plaintiff's insolvency and subsequent assignment for the benefit of its creditors put it in such a position that its ability to undertake volume production of magic tees was destroyed. If in the six-year period the need for the volume production of these tees arises, plaintiff will be incapable of doing what it agreed to do, and defendant will not have gotten what it contracted for. Even if the need never arises, defendant has still been deprived of what it bargained for, which was to have ready throughout the six-year period a manufacturer able to manufacture these tees in the required volume. This being the purpose of the Signal Corps, to have such a manufacturer ready and able, it was necessary, if it adhered to its original plan, for it to prepare another manufacturer to produce them immediately upon the plaintiff's becoming incapacitated to do so. The money it had spent on plaintiff was wasted, since it was necessary for it to spend an equal amount in training someone else.

■ The assignment for the benefit of creditors operates as a present and total breach of the contract, for it is an implied condition in every contract that the promisor will not permit itself, through insolvency or acts of bankruptcy, to be disabled from making performance. Central Trust Co. of Illinois v. Chicago Auditorium Ass'n, 240 U.S. 581, 591, 36 S.Ct. 412, 60 L.Ed. 811; Roehm v. Horst, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953; Pennsylvania Steel Co. v. New York City R. Co., 2 Cir., 198 F. 721, 743.

But, plaintiff says there was no consideration for the agreement to stand by. It says that the consideration paid was no more than reimbursement for the cost of taking Steps I, II, and III, and that no consideration was paid for Step IV or for the obligation to maintain itself in a state of readiness to take it.

It says defendant did not commit itself to buy any tees from plaintiff, whether a national emergency arose or not, and this is true. However, the consideration plaintiff received was the acquisition of the ability, not previously possessed, to promptly manufacture these tees in volume, and thus to be in position to realize a profit from manufacturing any tees that might be ordered. Had the Signal Corps not spent $135,754.48 for preparatory Steps I and II, and $37,907.-37 for preparatory Step III, plaintiff would not have been prepared to promptly make these tees in volume, and thus would not have been in position to realize a profit from the contract.

It is true defendant did not commit itself to order any tees, and thus enable plaintiff to realize a profit, but plaintiff knew it was taking this risk, and was willing to take it, in order to equip itself to take advantage of the opportunity to realize a profit, if the occasion arose. Defendant spent its money, around $180,-000, to equip plaintiff for the occasion and for plaintiff's agreement to stand ready to respond, in case of need. Except for its agreement to stand ready, defendant would not have spent the money to prepare plaintiff.

The instant case is distinguishable from the case of Tennessee Soap Co. v. United States, 126 F.Supp. 439, 130 Ct. Cl. 154, which is cited by plaintiff's attorney. In that case, the Soap Company was excused from its failure to deliver soap when ordered by the defendant, because the contract between the parties lacked mutuality since the defendant was under no obligation to buy soap in the first instance. In the present case, however, the issue of mutuality is never reached. The plaintiff obligated itself to stand by for six years. As we have pointed out, the defendant paid a large sum of money for this obligation. There is no lack of mutuality for this agreement. The question which the plaintiff would have us decide can only arise after the defendant has ordered magic tees and the plaintiff has refused to deliver them. We will not anticipate what may happen then.

Defendant is entitled to recover damages for plaintiff's breach of its contract. The measure thereof is the cost of repairing the damage caused by plaintiff's breach. It would seem that this would be the cost, as of October 1, 1953, of preparing another manufacturer to stand by, willing and ready to take Step IV in case of need.

This seems a heavy price for plaintiff to have to pay for its insolvency, but the defendant ought not to pay this cost, because, through plaintiff's fault, it did not get what it bargained for. Some one must lose the money spent in preparing plaintiff; that person through whose fault the expenditure became useless should be the one to do so, not the person who was blameless.

Plaintiffs' motions for summary judgment and to dismiss defendant's counterclaims are denied, and defendant's motion for summary judgment will be granted, and the assignees' petition must be dismissed. Defendant may recover of the Pennsylvania Exchange Bank and Samuel H. Roseman, to the extent that they hold assets of Joseph Lerner & Son, Inc., in their capacity as assignees, the amount previously paid of $92,843.-12, less the value to the defendant, if any, of the items delivered to defendant by plaintiff under Step I of the contract, and less also the sum of $1,922.23, the balance due on the cost of acquisition of the tools required under Step III. (Defendant repossessed these tools.) Since there is nothing in the record from which the value to the defendant of the articles manufactured by plaintiff can be ascertained, it will be necessary, in the absence of a stipulation, to refer the

case to a commissioner under Rule 38 (c), 28 U.S.C.A., for the sole purpose of ascertaining the value to the defendant of said items.

It is so ordered.

BASTIAN, Circuit Judge, sitting by designation, JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.