**HEMET VALLEY FLYING SERVICE COMPANY**

v.

**The UNITED STATES.**

No. 286–80C.

United States Claims Court.

March 13, 1985.

Michael R. Sullivan, Los Angeles, Cal., for plaintiff. Engstrom, Lipscomb & Lack, Los Angeles, Cal., of counsel.

Sandra P. Spooner, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. Stephen G. Anderson, Washington, D.C., of counsel.

## OPINION

MEROW, Judge:

Plaintiff, Hemet Valley Flying Service Company, brings this action for alleged breach of a one-year contract (with renewable options) it held with the United States Department of Agriculture Forest Service (Forest Service) in 1979 to provide air tankers for use in fighting forest fires. It is claimed that the Forest Service, in ordering the grounding of plaintiff's Fairchild C–119J tankers for the period of June 8–14, 1979, breached the contract. The case has been tried and post-trial briefs have been filed.

### Facts

Plaintiff is a corporation organized under the laws of California with its principal office of business located in Hemet, California. For over 20 years prior to the 1979 fire season, Hemet had supplied fire fighting aircraft, flight crews and material to the Forest Service.

In December 1978 the Forest Service issued a solicitation for bids to provide air tanker services at some 48 designated bases located throughout the western United States. For each designated base, the bid "Schedule of Items" listed a "designated period" which was defined as "The period of time for which availability may be required, which includes the mandatory period and the pre and post period." The bid

schedule of items listed a "mandatory period" for each base defined as "The period within the designated period for which availability of Air Tanker Service is required." The bid schedule included, for each designated base, a set daily rate in dollars for the "pre/post option" and a set hourly rate in dollars for each "Flight hour." The bidder was to insert, for each designated base bid, a daily bid rate for the mandatory availability period.

The contract terms involved in this solicitation provided for payment to be made for "availability" at "the applicable daily rate set forth in the Schedule of Items." Payment for flight time was required "at the predetermined contract unit price shown in the Schedule of Items." The contract did not set forth any specific number of flight hours. As to "availability," the contract terms provided (in part) that "During the mandatory period and any ordered pre or post season use, air tanker(s) shall be stationed and remain at their designated or alternate base of operations fully operational and ready for takeoff."

The "scope of contract" term provides as follows:

1. Air Tankers furnished under this contract will be operated from the designated base or other alternate bases located throughout the United States, including Alaska and will be used for dropping retardant on forest and range fires on all types of terrain. They shall be fully operational including qualified pilots, and shall provide the minimum retardant dropping capability specified in the Schedule of Items.

2. The Forest Service has cooperative arrangements for suppression of forest and range fires occurring on land administered by other agencies of the Federal Government, on State lands, and on privately-owned lands. The air tankers covered by this contract may be used under the terms and conditions herein stated when so ordered by the Contracting Officer for suppression of fires on such lands.

On January 30, 1979 Hemet submitted its bid to provide air tanker service at 24 of the 48 designated bases in the solicitation, using Fairchild C–119J tankers. These aircraft had been in air tanker service for some six years. Among the designated bases for which plaintiff bid were: Schedule of Item No. 24, Paso Robles, California, with a mandatory availability period from June 1–November 15, at a daily bid rate of $307.37; and Schedule of Items No. 25, Fox Field, California, with a mandatory availability period of June 3 to November 30, at a daily bid rate of $295.79.

In determining its availability daily bid rate, plaintiff estimated it would obtain some 150 flight hours at each location. This estimate was premised on plaintiff's analysis of flight hours at the locations for each season over the past five years. The flight rate set forth by the Forest Service in the schedule was $780 per hour (subsequently adjusted to $797.50). Based on past practice, the Forest Service was aware that air tanker contractors determined their daily "availability" rate to bid for a designated base after estimating the number of flight hours they could anticipate obtaining during the contract term.

On March 8, 1979 Forest Service Contract No. 55–12024B–9–183 was awarded to plaintiff on the basis of its January 30, 1979 bid. This contract included the designated bases of Paso Robles and Fox Field as noted above.

On June 8, 1979 tanker 133, a C–119 air tanker owned by Hawkins and Powers Aviation, Inc., a firm also under contract to the Forest Service, crashed while on a fire fighting mission. Both the pilot and co-pilot were killed. A preliminary investigation conducted on June 8 revealed that a part of the wing had separated during flight. Witness accounts described tanker 133 as being engaged in a normal drop when a part of the wing flew off. Conditions were windy and smoky, but drops from other aircraft had been made that day. Loss of a wing in flight is a most unusual occurrence.

At the time of the crash, Richard C. Millar was staff director for aviation and fire management in Region 5 of the Forest Service, an area encompassing all of California. The regional aviation officer serving immediately under Mr. Millar was Kenneth D. Otten. Mr. Otten had been a Navy pilot. Before joining the Forest Service he had also been a director, officer, shareholder and the chief pilot of Aero-Union Corporation, an air tanker operation under contract with the Forest Service. In his capacity as chief pilot for Aero Union, Mr. Otten gained considerable experience in C–119 aircraft as both a pilot in command and as a flight instructor. In addition, he had received training in aircraft investigation and had participated personally in at least one investigation of an air tanker crash. Mr. Millar, who is not a pilot, relied upon Mr. Otten for technical support regarding aviation and investigative matters.

Following the crash of tanker 133, an investigation team was set up by the Forest Service. Mr. Millar contacted his superiors in the Forest Service and informed them that he had concluded, on the basis of the available information, his and Mr. Otten's personal experience, and his own strong concern for pilot safety, to ground all C–119J aircraft in his region until the probable cause of the crash was determined. Before reaching this conclusion, neither Mr. Millar nor Mr. Otten contacted the owner of tanker 133 to obtain maintenance information and neither officer contacted the manufacturer of the aircraft.

Mr. Millar also recommended to his superiors that other Forest Service regions be ordered to ground C–119J aircraft pending the results of the crash investigation on tanker 133, but this was not done pending receipt of more information. Mr. Millar's grounding decision for Region 5 was not countermanded by his superiors.

Accordingly, on the afternoon of June 8, 1979 Mr. Millar grounded all C–119J aircraft in Region 5. The only C–119J's flying in Mr. Millar's region under contract

with the Forest Service were those owned by Hemet. Mr. James A. Venable, Hemet's secretary-treasurer, and the person responsible for its operations, was telephoned by the Forest Service concerning the grounding order on June 8, 1979 and a subsequent memo to that effect was issued on June 13, 1979.

On June 8, 1979, following the crash and the grounding order, Mr. Venable ordered his mechanics to check his aircraft for structural or other problems. At that time his Paso Robles aircraft was on the ground and his Fox Field aircraft was fighting the fire where the crash occurred. No problems were discovered by the mechanics. The next day, to expedite matters, Mr. Venable succeeded in having his maintenance supervisor placed on the Forest Service's crash investigating team.

Mr. Venable objected to the grounding order on June 9, 1979. His objection was based upon the information he had received from persons on the scene which indicated that a structural overload had caused the wing separation. In addition, Mr. Venable learned that only his aircraft had been grounded while C–119J's in other regions were flying missions.

During the weekend of June 9–10, the crash investigation team had a metallurgist examine the shorn wing. The metallurgist could not determine from a sight inspection whether a type defect or a structural overload was involved. A type defect would have been a serious problem as it would be present in all such aircraft. A structural overload would be a situation peculiar to tanker 133 and the manner in which it was being operated when the failure occurred. To resolve the question, a metallurgical laboratory test was ordered.

In the meantime, the Forest Service arranged to have two P2V aircraft under another contract ferried into Paso Robles and Fox Fields. These aircraft were assigned the missions which would, otherwise, have been flown by Hemet. The P2V is equivalent to a C–119J in fire fighting capacity. It was not unusual for the Forest Service to shift aircraft, under contract, from their designated base to an alternative base to meet fire fighting needs. During 1979 plaintiff's aircraft, on occasion, were so shifted.

On June 12, 1979 the metallurgical test on the shorn wing was completed with the conclusion that the probable cause for the failure had been a structural overload due to high turbulence in the area and high air speed.

As no type defect in the C–119J aircraft was found, on June 14, 1979 the Region 5 grounding order was cancelled and Hemet resumed operations on June 15, 1979. During 1979 Hemet was paid for more than 150 flight hours in each location and was paid its daily availability bid rate for the mandatory period including June 8–14, 1979, when its C–119J's were grounded.

Plaintiff timely filed a claim with the contracting officer to recover the flight revenue it lost during the period of June 8–14, 1979. The claim was denied and this litigation ensued.

*Discussion*

Plaintiff seeks to recover the flight hour revenue which it would have obtained under its contract with the Forest Service had its own Paso Robles and Fox Field C–119J air tankers not been grounded during the period of June 8–14, 1979.

Plaintiff asserts that its agreement with the Forest Service constituted a "requirements" contract. This type of contract requires that the contractor have the exclusive right and legal obligation to satisfy all of the government's needs for the contract services covered and that the government will purchase those needs only from the contractor. *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343, *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); *Inland Container, Inc. v. United States*, 206 Ct.Cl. 478, 512 F.2d

1073 (1975); *Ralph Const., Inc. v. United States,* 4 Cl.Ct. 727 (1984). Purchasing to satisfy needs covered by a requirements contract from one other than the contractor renders the government liable for damages. *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982).

■ In the instant matter, it is concluded that plaintiff's agreement with the Forest Service was not a "requirements" contract such as to preclude the Forest Service, for good faith reasons, from using other contractors' air tankers for flights out of the Paso Robles and Fox Field designated bases. Rather, the contract is determined to be one for an indefinite quantity with a sufficient purchase requirement for "availability" of the tankers to render it enforceable. *Torncello v. United States,* 231 Ct.Cl. at 28, 681 F.2d at 761.

Nowhere does the contract require that the government satisfy its flight needs out of Paso Robles and Fox Field exclusively by the use of plaintiff's tankers. It does require that plaintiff's tankers be available and that payment be made for this status. However, the nature of the air tanker contracts and their purpose required flexibility with respect to flight orders so that the Forest Service could coordinate its fire fighting needs with all the planes available under its contracts. Switching flights between bases and contractors for this purpose was a common practice. The "availability" to fly for which the Forest Service paid at the bid rates was an indivisible part of the contract such as to provide the consideration obligating plaintiff to satisfy whatever flight hour needs were ordered under the contract, although no purchase of any definite quantity of such hours was promised. *See Pennsylvania Exchange Bank v. United States,* 145 Ct.Cl. 216, 170 F.Supp. 629 (1959); *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982). Upon payment of the "availability" consideration, the Forest Service had no further obligation to order any specific amount of flight time. *Mason v. United States,* 222

Ct.Cl. 436, 615 F.2d 1343, *cert. denied,* 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980).

Accordingly, as the Forest Service did not breach the contract by using another contractor's tankers for fire fighting during the June 8–14, 1979 period, plaintiff has not established any valid basis on which to recover additional flight revenue for hours it did not fly.

■ Alternatively, were the contract to be construed as requiring the Forest Service to utilize plaintiff's available tankers at the designated bases, to the exclusion of others, then plaintiff still has not established a basis for recovery of the additional flight revenue sought. This is because the contract contained a "suspension of work" clause which permitted plaintiff's contract work to be suspended for a reasonable period of time without additional compensation, "for the convenience of the Government." Only in the event of a suspension for an "unreasonable period of time" did the contract provide that "an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension * * *." What constitutes a reasonable time period depends upon the circumstances of each case. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 745, 572 F.2d 786, 804 (1978).

■ Given the very unusual occurrence of the loss of a wing in flight on a C–119, the need for investigation and metal testing to ascertain the cause of the failure and the good faith concern for air crew safety evidenced by the Forest Service officials, Mr. Millar and Mr. Otten, it is concluded that the relatively brief grounding of plaintiff's C–119 tankers constituted a suspension of any contract flight requirement for only a reasonable period of time. The relatively brief nature of the event is also evident from the fact that, in performing under this contract, plaintiff obtained more than the 150 hours of flight compensation it estimated during bidding. In these cir-

cumstances, no additional compensation is due.

### Conclusion

For the foregoing reasons, plaintiff has not established any valid basis on which a recovery for hours not flown could be premised and it is ORDERED that a final judgment be entered dismissing plaintiff's complaint.[1]

---

1.  Given this result, it is not necessary to address defendant's request for reconsideration of the trial ruling rejecting, as belated, the attempt to add the affirmative defense of release not previously raised in the pleadings or during pretrial proceedings.