# United States Court of Appeals for the Federal Circuit

2007-5067

AMERICAN SAVINGS BANK, F.A., KEYSTONE HOLDINGS, INC.,
KEYSTONE HOLDINGS PARTNERS, L.P., N.A. CAPITAL HOLDINGS, INC.,
NEW AMERICAN CAPITAL, INC., NEW AMERICAN HOLDINGS, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Kent A. Yalowitz, Arnold & Porter LLP, of New York, New York, argued for plaintiffs-appellees. With him on the brief were Melvin C. Garbow, Howard N. Cayne, Michael A. Johnson, Joshua P. Wilson, and Alexea R. Juliano, of Washington, DC.

Kenneth M. Dintzer, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne F. Davidson, Director and Sameer Yerawadekar, Trial Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge Loren A. Smith

# United States Court of Appeals for the Federal Circuit

2007-5067

AMERICAN SAVINGS BANK, F.A., KEYSTONE HOLDINGS, INC.,
KEYSTONE HOLDINGS PARTNERS, L.P., N.A. CAPITAL HOLDINGS, INC.,
NEW AMERICAN CAPITAL, INC., NEW AMERICAN HOLDINGS, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 92-CV-872, Senior Judge Loren A. Smith.

_____

DECIDED: March 6, 2008

_____

Before MICHEL, <u>Chief Judge</u>, NEWMAN and PROST, <u>Circuit Judges</u>.

PROST, <u>Circuit Judge</u>.

The government appeals several decisions of the United States Court of Federal Claims granting summary judgment in favor of American Savings Bank, F.A., Keystone Holdings, Inc., Keystone Holdings Partners, L.P., New American Capital, Inc., New American Capital Holdings, Inc., and New American Holdings, Inc. (collectively "Plaintiffs"). We affirm as to liability and affirm-in-part, reverse-in-part, vacate-in-part, and remand as to damages.

BACKGROUND

The present case is related to the <u>Winstar</u> line of cases and relevant general background facts are detailed in <u>United States v. Winstar Corp.</u>, 518 U.S. 839, 844-59 (1996). In 1988, the Federal Savings and Loan Insurance Corporation ("FSLIC") assumed responsibility for the liabilities of the failed thrift American Savings and Loan Association of Stockton, California ("Old American"). <u>Am. Sav. Bank, F.A. v. United States</u>, 62 Fed. Cl. 6, 9 (2004) ("<u>American Savings II</u>"). At the time, Old American was the largest failed thrift in the United States and it was estimated that it would cost the FSLIC more than $3 billion to liquidate it. <u>Id.</u> The Federal Home Loan Bank Board ("FHLBB") and the FSLIC agreed to a plan with investor Robert Bass and his associates ("the Bass Investors") wherein Old American was divided into two thrifts—an operating thrift called American Savings Bank, F.A. ("New American") and a liquidating thrift called New West Federal Savings and Loan Association ("New West"). <u>Id.</u> This division left New American with a surplus of liabilities over assets of approximately $8 billion, and New West with a surplus of assets over liabilities of approximately $8 billion. <u>Id.</u> In order to facilitate the transaction, New West issued an $8 billion note guaranteed by the FSLIC to New American (the "FSLIC Note"). <u>Id.</u> Keystone Holdings Partners, L.P. (the "Partnership"), formed by the Bass Investors, used several wholly-owned companies— including Keystone Holdings, Inc. ("Keystone"), New American Capital, Inc. ("NA Capital"), New American Capital Holdings, Inc. ("NA Capital Holdings"), and New American Holdings, Inc. ("NA Holdings")—to acquire Old American. <u>Id.</u>

As part of the agreement, the FSLIC received stock warrants (the "Warrants"), which essentially gave it a thirty percent ownership interest in New American. <u>Id.</u> at 9-

10. New American received assistance from the FSLIC pursuant to an Assistance Agreement. Id. The Assistance Agreement incorporated two regulatory forbearances— the "Note Forbearance" and the "Warrant Forbearance"—which reduced the amount of regulatory capital New American needed to remain in regulatory capital compliance. Id. at 10. The Note Forbearance essentially provided that New American would not have to support the $8 billion FSLIC Note with capital to meet regulatory capital requirements. Id. The Warrant Forbearance provided that the value of the Warrants could be counted towards regulatory capital for certain purposes.[1] Id.

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989). As a result of the enactment of FIRREA, New American could no longer rely upon the Note Forbearance and Warrant Forbearance for regulatory capital purposes. American Savings II, 62 Fed. Cl. at 10. On December 28, 1992, Plaintiffs filed suit against the government in the United States Court of Federal Claims.

The United States Court of Federal Claims issued four published opinions in this matter. In the first opinion, the trial court denied the government's motion to compel liability discovery. Am. Sav. Bank, F.A. v. United States, 50 Fed. Cl. 586, 587 (2001). In the second opinion, the trial court granted Plaintiffs' motion for summary judgment as to liability and denied the government's cross-motion for summary judgment as to liability. Am. Sav. Bank, F.A. v. United States, 52 Fed. Cl. 509, 513 (2002) ("American Savings I"). In the third opinion, the trial court granted-in-part and denied-in-part

---

[1] The transactions at issue in the present case are discussed in more detail in American Savings II, 62 Fed. Cl. at 9-10.

Plaintiffs' and the government's respective motions for summary judgment as to damages and partial restitution. American Savings II, 62 Fed. Cl. at 8. In the fourth opinion, the trial court granted Plaintiffs' motion for summary judgment as to damages and partial restitution offset calculations, awarding Plaintiffs $401,534,000. Am. Sav. Bank, F.A. v. United States, 74 Fed. Cl. 756, 762 (2006) ("American Savings III").

The government appeals the trial court's ruling as to liability, its award of damages and the offset calculation relating to the Note Forbearance, and its award of partial restitution and the offset calculation relating to the Warrant Forbearance. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

In the present case, the trial court decided both liability and damages on summary judgment. We review a trial court's decisions on summary judgment and conclusions of law without deference. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

On appeal, the government argues that the trial court erred in granting Plaintiffs' summary judgment motions as to liability, as to the damages and offset calculation relating to the Note Forbearance, and as to the partial restitution and offset calculation relating to the Warrant Forbearance. We take each issue in turn.

A. Liability

The dispute as to liability centers on section 9 of the Assistance Agreement titled "Tax Benefits." Within the Tax Benefits section, there is a subsection entitled "Effect of

Material Change of Law." Assistance Agreement § 9(i). The Effect of Material Change of Law subsection provides a way for Keystone Holdings to modify its obligation to pay a minimum of $300 million in tax benefit payments to the FSLIC if there is a qualifying material change in the law. A "Material Change of Law" is defined in the Assistance Agreement as follows:

> [A] change in tax or non-tax law after the Effective Date, including, without limitation, a change in the Closing Agreement, the Forbearance Letter, any Federal, state or local statute, court decision, regulation, ruling or other administrative practice or order, or any lapse or reinterpretation of existing law (a "Change of Law"), which prevents Parent Company Group from utilizing, or makes it impracticable for the Parent Company Group to utilize, the items of tax deduction elimination from the computation of Adjusted Hypothetical Federal Income Tax Liability . . . .

Id. § 9(h)(15). After the enactment of FIRREA, Plaintiffs invoked the Material Change of Law provision of the Assistance Agreement. American Savings I, 52 Fed. Cl. at 510. Thereafter, the parties agreed to a Settlement Agreement limiting Plaintiffs' tax benefit payment obligations. Id.

As it did before the trial court, the government argues on appeal that the elimination of the Warrant Forbearance and Note Forbearance as a result of the passage of FIRREA was not a breach of the Assistance Agreement. According to the government, the parties anticipated and allocated the risk of a change of law by agreeing to a contractual remedy in the Material Change of Law provision of the Assistance Agreement. The government submits that the inclusion of the forbearance letter in the Material Change of Law provision precludes Plaintiffs from claiming any remedy for elimination of the forbearances other than that provided in the Tax Benefits section. In short, the government argues that the Material Change of Law provision is a general risk allocation provision precluding any additional recovery. Plaintiffs disagree,

arguing that the Material Change of Law provision is not a general risk allocation provision; rather, they argue that its scope is limited to the issue of Plaintiffs' obligation to make tax benefit payments to the FSLIC.

The trial court noted that Plaintiffs presented "one of the strongest prima facie demonstrations of the existence of a Winstar-type contract." Am. Sav. Bank, 50 Fed. Cl. at 586. Considering the relevant language of the Assistance Agreement, it determined that the Material Change of Law provision was intended to reduce Plaintiffs' "affirmative obligation to make payments to the FSLIC in the event that a material change in law made it more difficult to achieve earnings which the losses could shelter." American Savings I, 52 Fed. Cl. at 511. In reaching this determination, it relied on the fact that the Material Change of Law provision is located in the Tax Benefits section of the Assistance Agreement and that the definition and explanation of a Material Change of Law are each "expressly confined" to the Tax Benefits section of the Assistance Agreement. Id. It further noted that under the government's interpretation of the Assistance Agreement, the government could seize the thrift and the only relief available to Plaintiffs would be that they would not have to pay a minimum of $300 million in tax benefit payments to the government. Id. at 512. The trial court concluded that the "Material Change of Law provision . . . does not operate to preclude a claim for damages," thus finding the government liable for breach of contract as a result of the enactment of FIRREA. Id. at 511, 513. In light of the language of the Material Change of Law provision, its location in the Tax Benefits section, and its definitions, we agree with the trial court that it is not a general risk allocation provision barring further recovery.

Despite the clear scope of the Material Change of Law provision based on the language of the contract, the government argues that the trial court's interpretation of the Assistance Agreement is in conflict with the parties' negotiating history and with the parties' conduct after the enactment of FIRREA. As to the parties' negotiating history, we are not persuaded by the government's argument that the addition of the forbearance letter to the definition of a Material Change of Law demonstrates that the Material Change of Law provision was intended to be a general risk allocation provision. Regarding this issue, the trial court determined that Plaintiffs did not "abandon[] their belief that the forbearances were contractually enforceable" by adding the forbearance letter to the definition of Material Change of Law; rather, "[P]laintiffs wanted to insure that they could invoke the provisions of, and reduce their obligations under, the tax benefit provision even if the government challenged the contractual status of the forbearances." Id. at 512. In addition, the parties' conduct after the enactment of FIRREA supports, rather than contradicts, the trial court's interpretation of the Assistance Agreement. For example, the Settlement Agreement between the parties after the enactment of FIRREA provides:

> There are a number of disputes which exist between the parties with respect to the Transaction Related Documents. This settlement Agreement relates solely to the dispute over whether or not a General or Stockton Material Change of Law has occurred as set forth in the [Material Change of Law] Notices.

Id. at 513 (quoting the Settlement Agreement). As the trial court found, this language supports a finding that the Material Change of Law provision does not prevent Plaintiffs from litigating other disputes regarding the Transaction Related Documents, such as the current suit. See id. at 512-13.

In sum, we agree with the trial court that the Material Change of Law provision of the Assistance Agreement does not preclude Plaintiffs' claims relating to the elimination of the Note Forbearance and Warrant Forbearance. Accordingly, we affirm the trial court's ruling as to liability. Id. at 513.

## B. Note Forbearance Damages and Offset

As previously discussed, New West issued the FSLIC Note to New American to facilitate the transaction. At the time of the transaction, FSLIC regulations required New American to maintain three percent of its total liabilities as regulatory capital. American Savings II, 62 Fed. Cl. at 11. Thus, to meet regulatory capital requirements relating to the $8 billion FSLIC Note, New American was required to maintain $240 million in capital. Id. The FSLIC agreed to provide New American with the Note Forbearance, eliminating the need for New American to support the $8 billion FSLIC Note with capital to maintain regulatory capital compliance. Id. The enactment of FIRREA, however, voided the Note Forbearance, resulting in New American having to support the FSLIC Note with real capital to maintain regulatory capital compliance. Id. New American, however, did not raise additional capital to meet regulatory capital requirements; rather, it used a portion of its pre-existing capital to maintain regulatory capital compliance. Id. at 12. The American Savings II trial court determined that "the $240 million used to meet regulatory capital requirements was greatly restricted, and could not be leveraged as Plaintiffs would have been entitled to do, but for the breach." American Savings III, 74 Fed. Cl. at 761 (describing the trial court's findings in American Savings II). The trial court granted Plaintiffs' summary judgment motion as to the Note Forbearance damages and offset, awarding damages of the "cost of capital to Plaintiffs minus

benefits gained from 'real' assets (as opposed to government forbearances)." Id. at 761-762.

On appeal, the government argues that the trial court erred in granting Plaintiffs' summary judgment motions as to the damages and offset calculation relating to the Note Forbearance. With regard to this issue, the government makes a number of arguments, including that Plaintiffs would have incurred the same capital costs even absent the breach and that the trial court's analysis of the Note Forbearance damages claim does not support the award granted. Plaintiffs' arguments in response include that the elimination of the Note Forbearance greatly restricted their use of certain capital after the elimination of the Note Forbearance and that the government induced Plaintiffs to accept a lower rate on the FSLIC Note by promising to provide the Note Forbearance.

The trial court, accepting Plaintiffs' arguments, analogized the costs Plaintiffs paid to capital providers to situations where the government must pay a contractor's rental costs for an item, such as equipment, if the government fails to provide the item after it induces the contractor to accept a lower contract price despite promising to provide the item. See American Savings II, 62 Fed. Cl. at 13-14. The trial court accepted Plaintiffs' contention that the government induced them to accept a lower interest rate on the FSLIC Note by promising that Plaintiffs would not have to support the FSLIC Note with regulatory capital. Id. at 13. Accepting Plaintiffs' proposed methodology, it awarded Plaintiffs the actual costs paid to capital providers, in the form of interest and dividend payments, for the pre-existing assets used to meet regulatory capital requirements, less the benefit that they obtained from the restricted use of these

assets after the enactment of FIRREA. Id. at 13-14. The trial court found that the actual costs Plaintiffs paid to capital providers to maintain regulatory compliance after the elimination of the Note Forbearance totaled $178,850,000. American Savings III, 74 Fed. Cl. at 762.

Plaintiffs submit that several prior Winstar-related decisions by this court, including Home Savings of America v. United States, 399 F.3d 1341 (Fed. Cir. 2005), support the trial court's award of Plaintiffs' capital costs resulting from the breach of the Note Forbearance. In Home Savings, this court affirmed an award for the full amount of replacement capital raised by a thrift to replace supervisory goodwill that was eliminated as a result of the enactment of FIRREA. Id. at 1358. The trial court "calculated the damages as the difference between what it cost [the thrift] to raise that tangible capital and the benefit [the thrift] derived from possessing that capital instead of an equal amount of supervisory goodwill." Id. at 1352. This court stated that "the Court of Federal Claims properly noted that capital is not costless; its cost is the required rate of return on various terms of financing." Id. at 1354.

The government argues that Home Savings is different from the present case because, "the capital raisings were caused by the breach" in Home Savings. Plaintiffs' use of capital raised prior to the enactment of FIRREA, however, does not leave them without a remedy for the actual costs paid to capital providers in the form of interest and dividend payments for the capital necessary to remain in regulatory capital compliance after the enactment of FIRREA eliminated the Note Forbearance. The elimination of the Note Forbearance caused Plaintiffs to use "real" capital (as opposed to regulatory forbearances) to support the FSLIC Note. Additionally, while Plaintiffs were not required

to raise additional capital because of the breach, they were required to maintain their inventory capital to satisfy the higher capital requirement when the Note Forbearance was no longer available. Absent the breach, this capital would have been available to Plaintiffs for other profitable uses or for repayment to investors to avoid the ongoing costs of maintaining the capital. Thus, the breach required Plaintiffs to pay the cost of maintaining capital. Based on the unique circumstances of this case in the Winstar context, we affirm the trial court's award of the actual costs Plaintiffs paid to capital providers to maintain regulatory capital compliance as a result of the elimination of the Note Forbearance by the enactment of FIRREA. American Savings II, 62 Fed. Cl. at 14.

Having determined that Plaintiffs are entitled to recover the actual costs paid to capital providers to maintain regulatory capital compliance as a result of the elimination of the Note Forbearance, the trial court next determined whether it should offset the damages award by benefits gained by Plaintiffs. The "benefits gained from 'real' assets" may be referred to as the "offset." See American Savings III, 74 Fed. Cl. at 761. The offset was determined by estimating the benefit to New American of the real assets used to meet regulatory capital requirements. Id. "Because it [was] impossible to trace the $240 million [used to meet regulatory capital requirements] to particular assets, the [trial court] . . . use[d] an approximation." Id. As an approximation, the trial court applied "the historic, actual rate of interest the Government paid Plaintiffs on the FSLIC Note." Id. Applying this interest rate, the trial court determined the offset amount to be $123,822,000. Id.

The government argues that the trial court's calculation of the Note Forbearance offset is flawed and that genuine issues of material fact preclude summary judgment. In particular, the government contends that it was error for the trial court to disregard two expert affidavits on summary judgment. In American Savings III, regarding the Note Forbearance offset, the trial court found two affidavits presented by the government "unpersuasive." Id. at 762. On appeal, however, the government does not point to the substance of these affidavits to demonstrate disputed issues of material fact. Indeed, the government did not even include copies of these affidavits in the joint appendix. In these circumstances, we cannot conclude that the trial court erred in calculating the Note Forbearance offset on summary judgment.

In sum, we agree that the offset calculation methodology applied by the trial court was proper, which is consistent with the offset calculation methodology affirmed by this court in Home Savings. 399 F.3d at 1358. Accordingly, we affirm the Note Forbearance offset calculated by the trial court and we affirm the damages award of $55,028,000 relating to the Note Forbearance. American Savings III, 74 Fed. Cl. at 762.

### C. Warrant Forbearance Remedy

Finally, the government argues that the trial court erred in granting Plaintiffs' summary judgment motion as to the award of partial restitution and the offset calculation relating to the Warrant Forbearance. The government makes a number of arguments as to this issue, including that the trial court erred in finding the contract divisible and that the election doctrine precludes Plaintiffs from claiming partial restitution as a remedy. Plaintiffs' arguments in response include that the trial court properly found a

divisible contract and that their continued performance after breach was not an election of remedies.

In 1996, New American was acquired by Washington Mutual. American Savings II, 62 Fed. Cl. at 15. After the sale, the government accepted Washington Mutual stock in return for the Warrants. Id. The government subsequently sold the stock for $651.7 million, net of sales costs. Id. Plaintiffs then filed the present suit seeking to recover the benefit that the government received for the Warrants under a restitution theory based on FIRREA's elimination of the Warrant Forbearance.

Plaintiffs do not seek restitution as to the contract as a whole by unwinding the entire transaction; rather, they seek restitution as to only a portion of the contract by attempting to unwind only that portion of the contract, while seeking damages as to the remainder of the contract. While the Court of Federal Claims in this case acknowledged that "[r]estitution is generally awarded with respect to the contract as a whole," it provided that a claim for partial restitution may be awarded in some cases as to a portion of a contract if it is found to be "meaningfully divisible." Id. at 16.

As the Court of Federal Claims recognized, there is a "presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992); see also Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1053 (Fed. Cir. 2006) (same). The trial court found that Plaintiffs had the burden to show a "quid pro quo exchange of the Warrant for the $167 million in regulatory capital as well as the value of the deposit base." American Savings II, 62 Fed. Cl. at 17. The trial court correctly noted that the parties clearly intended the value

of the Warrants to count as regulatory capital.  Id.  The trial court also noted that Plaintiffs stated repeatedly during negotiations that the Warrants would be revocable if the FSLIC failed to perform its assistance obligations.  Id. at 18.  After finding that the forbearances were part of the assistance obligations, it held that "the Warrant and the Warrant Forbearance were linked as part of this transaction, and can be unwound from the acquisition transaction as a whole as a matter of law."[2]  Id.  Accordingly, it determined that "Plaintiffs are legally entitled to pursue a claim for partial restitution."  Id.  The trial court then calculated the partial restitution remedy as the amount the government ultimately received for the Warrants ($651.7 million) offset by the amount Plaintiffs benefited ($167 million deposit premium plus the change in the value of that premium during the eight year period from the execution of the deal to the sale of the warrants; later determined to total $305,194,000).  Id. at 19; American Savings III, 74 Fed. Cl. at 760-61.

We hold that Plaintiffs did not show that the contract was divisible, and the Court of Federal Claims erred in awarding partial restitution for this breach.  Because we find

---

[2]    Some of the language used by the trial court to describe the quid pro quo is arguably ambiguous in referring to the Warrants and the Warrant Forbearance, while not explicitly mentioning the value of the deposit base.  However, in the context of the opinion as a whole, we conclude that the trial court was simply using shorthand in these instances, and that it considered the divisible portion of the contract to be an exchange of (1) the Warrants for (2)(a) the Warrant Forbearance and (b) the receipt of the value of the Old American deposit base.  See, e.g., American Savings II, 62 Fed. Cl. at 17 ("Plaintiffs argue that the Warrant was given to FSLIC in exchange for two aspects of the transaction: the receipt of the value of Old American's deposit base, and the agreement from FSLIC and FHLBB that the value could be treated as regulatory capital."), ("Plaintiffs must establish a quid pro quo exchange of the Warrant for the $167 million in regulatory capital as well as the value of the deposit base.").  In any event, the result would be the same even if the quid pro quo recognized by the trial court was an exchange of (1) the Warrants for (2) the Warrant Forbearance because we find that the contract at issue is not meaningfully divisible either way.

that the trial court improperly divided the contract and that the trial court's award of partial restitution was improper on that basis, we do not reach the government's argument as to whether the election doctrine, as discussed in Old Stone Corp. v. United States, 450 F.3d 1360 (Fed. Cir. 2006), would bar restitution as to the portion of the contract unwound by the trial court.

We consider the language of a contract and the intent of the parties in determining whether a contract is divisible. See Stone Forest, 973 F.2d at 1552-53 (considering contract language and the intent of the parties in finding that a contract was not divisible); see also Pa. Exch. Bank v. United States, 170 F. Supp. 629, 632 (Ct. Cl. 1959) (considering contract language to determine the purpose of the contract in reaching the conclusion that a contract was not divisible); accord In re Payless Cashways, 203 F.3d 1081, 1085 (8th Cir. 2000) ("The primary inquiry when determining if a contract is divisible is the intent of the parties. The intent can be surmised by examining the language that the parties used and the subject matter of the agreement." (citations omitted)). Plaintiffs submit that several provisions of the Assistance Agreement support the divisible remedy awarded by the trial court. Plaintiffs do not, however, point to any provision of the Assistance Agreement specifically providing for divisibility of the portion of the contract unwound by the trial court—the Warrants in exchange for the Warrant Forbearance and the value of the deposit base. Instead, Plaintiffs rely on more general provisions—sections 24, 26(b), and 32 of the Assistance Agreement—that do not specifically address the divisible remedy sought by Plaintiffs in the present case. Plaintiffs submit that these provisions demonstrate an agreement by the parties "to accept remedies that take account of the parties' 'purpose and intent,'

subject to the guiding principle that the quantum of each remedy should correspond to the magnitude of the breach-caused loss." Appellees' Br. 38-39.

We address sections 24, 26(b), and 32 in turn. Section 24 provides that "[n]o failure or delay by any party in exercising or partially exercising any such right, power, or remedy shall operate as a waiver or preclude the further exercise of such right, power, or remedy." Assistance Agreement § 24. This provision addresses waiver; it does not provide any support for the trial court's finding of divisibility. Section 26(b) provides:

> If any provision of this Agreement is invalid or unenforceable, then this Agreement shall, to the extent possible, be reformed to carry out its entire purpose and intent (including, without limitation, the purpose and intent of the invalid or unenforceable provision), and this Agreement as so reformed, shall remain in full force and effect and shall be binding . . . .

Id. § 26(b). This provision addresses contract reformation; it does not provide support for dividing a valid, enforceable agreement into separate portions to allow a claim of partial restitution. Section 32 provides that "[a]ny liability, forfeiture or other remedy for any breach, default or failure by any party to perform or comply in any material respect with any of its obligations hereunder or under any other agreement or understanding referenced herein shall correspond to the magnitude of the economic loss caused thereby to the other party or parties." Id. § 32. This provision does not provide support for dividing a contract into separate portions to allow a claim of partial restitution. In fact, as related to the abrogation of the Warrant Forbearance in the present case, an award of damages based on Plaintiffs' loss related to the elimination of the Warrant Forbearance would appear to more closely correspond to the "magnitude of the economic loss caused" to Plaintiffs than the trial court's award of partial restitution based on the value of the Warrants. Thus, even if we accept Plaintiffs' general

characterization of the language of the Assistance Agreement, there is still no support for a finding that the "purpose and intent" of the parties supports dividing the agreement into separate portions to allow a claim of partial restitution, or that such a remedy would "correspond to the magnitude of the breach-caused loss." Appellees' Br. 38-39. In sum, we have considered the provisions of the Assistance Agreement submitted by Plaintiffs and we find that they do not support the divisible contract recognized by the trial court.

Plaintiffs also submit portions of the negotiating history in support of the divisible contract recognized by the trial court. The government argues that the trial court erred in considering the negotiating history as to the issue of divisibility because the language of the Assistance Agreement does not support a finding of divisibility. As discussed below, we conclude that the negotiating history, even if considered, does not support the divisible contract that the trial court found.

The Warrant Forbearance was discussed and negotiated by the parties after the Warrants were already part of the proposed agreement. See American Savings II, 62 Fed. Cl. at 17 ("The Term Sheet also specifies that 'the amount of warrants is tied to American's retail deposit base.' This Term Sheet does not mention the possibility of a Warrant Forbearance."). This suggests that the parties were not making a separate quid pro quo that linked the Warrants to the Warrant Forbearance. The trial court stated that "[c]ritical to the divisibility of this aspect of the contract is the repeated statement made by Plaintiffs during the negotiation of the contract that the Warrant would be revocable should FSLIC be 'unable to perform its assistance obligations.'" Id. at 18 (citation omitted). While these statements and some documents suggest that Plaintiffs

believed the Warrants would be revocable if the FSLIC failed to perform its assistance obligations, the forbearances were not the FSLIC's only assistance obligations. In other words, while FIRREA made it impossible for FSLIC to honor the accounting forbearances, which were a part of its assistance obligations, FSLIC honored other assistance obligations. Indeed, the Court of Federal Claims recognized this, but found it irrelevant because the trial court considered the Warrant Forbearance the "specific benefit relevant to the divisible contract in question." Id. at 16. We disagree. Assuming that the negotiating history linked the Warrants to the government's assistance obligations, this suggests that the parties intended the Warrants to be part of the overall transaction—if the government committed a total breach by being unable to perform all its assistance obligations, the Warrants would be void—but it does not support the conclusion that the parties intended to void the Warrants if the government's failure to provide assistance was limited to its failure to honor the Warrant Forbearance.

Moreover, Plaintiffs sought and have been awarded damages based on the elimination of the Note Forbearance—another one of the FSLIC's assistance obligations—in the present case. Thus, even if we assume arguendo that a failure by the government to honor its assistance obligations—which included, but were not limited to, the Note Forbearance and the Warrant Forbearance—would entitle Plaintiffs to revoke the Warrants, awarding partial restitution for the value of the Warrants in addition to awarding damages for the elimination of the Note Forbearance would

amount to an unfair windfall for Plaintiffs.[3]

For all these reasons, Plaintiffs fail to overcome the presumption that each and every term and condition in the contract was given in consideration of all the others. Because the Court of Federal Claims incorrectly found the contract divisible and awarded partial restitution on that basis, we reverse the trial court's award of partial restitution relating to the Warrant Forbearance and remand for the trial court to determine if damages, as opposed to partial restitution, are proper under another

---

[3]     Plaintiffs also submit that this court's decision in First Nationwide Bank v. United States, 431 F.3d 1342 (Fed. Cir. 2005), supports a finding of divisibility in the present case.  We disagree.  There are many differences between First Nationwide and the present case.  For example, in First Nationwide, this court affirmed a damages award where the trial court found that the portion of the contract at issue was the result of separate negotiations, resulting in separate provisions of the contract, and that it was "meaningfully divisible" from the remainder of the contract.  See First Nationwide Bank v. United States, 51 Fed. Cl. 762, 769-770 (2002), aff'd, 431 F.3d 1342 (Fed. Cir. 2005). In the present case, we find that the Warrants were part of the overall consideration and that Plaintiffs failed to rebut the presumption that each and every term and condition in the contract was given in consideration of all the others.  Additionally, in First Nationwide this court noted that "[t]he [trial] court called this remedy a form of 'partial restitution,' explaining that 'there are situations in which a fair solution requires partial rescission or equivalent relief, and a failure to recognize this can result in manifest injustice.'"  431 F.3d at 1352 (quoting First Nationwide, 51 Fed. Cl. at 769 (quoting George E. Palmer, The Law of Restitution § 12.6(d) (1978))).  Based on the particular facts of the present case, a refusal to divide the contract to allow Plaintiffs to seek partial restitution would not in our view result in "manifest injustice."  Further, "[a]lthough the First Nationwide court . . . characterized the claim as one for 'partial restitution,' the plaintiff in that case claimed amounts that it was promised by the government, not amounts that it actually expended under the contract."  Old Stone, 450 F.3d at 1374 n.13 (determining that "the claim in First Nationwide was not a true restitution claim").  In contrast, in the present case the Warrant Forbearance remedy awarded by the trial court was based on amounts Plaintiffs expended under the contract (the value of the Warrants), rather than amounts promised by the government.

theory.  Because we reverse the trial court's award of partial restitution relating to the Warrant Forbearance, we vacate its calculation of the Warrant Forbearance offset.[4]

## CONCLUSION

For the reasons stated above, we affirm the trial court's ruling as to liability and its award of damages and the offset calculation relating to the Note Forbearance.  We reverse the trial court's award of partial restitution relating to the Warrant Forbearance, vacate its calculation of the Warrant Forbearance offset, and remand for further proceedings consistent with this opinion.

## COSTS

Each party shall bear its own costs.

## AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED

---

[4]  We express no opinion as to whether the trial court's calculation of the Warrant Forbearance offset was correct.